Submitted December 19, 2008, resubmitted en banc June 17, reversed and remanded September 30, 2009

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## ALEM JONATHAN ANDERSON,
*Defendant-Appellant.*

Marion County Circuit Court
05C51184; A135075

217 P3d 1133

Peter Gartlan, Chief Defender, and Mary Shannon Storey, Deputy Public Defender, Legal Services Division, Office of Public Defense Services, filed the brief for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Leigh A. Salmon, Assistant Attorney General, filed the brief for respondent.

Before Brewer, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Wollheim, Schuman, Ortega, Rosenblum, and Sercombe, Judges.

SCHUMAN, J.

Edmonds, J., dissenting.

### SCHUMAN, J.

Defendant was convicted of delivery of a controlled substance. On appeal, he assigns error to the trial court's denial of his motion to suppress evidence. The motion was based on defendant's argument that the evidence was discovered after police officers, in violation of Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution, stopped and questioned him and a companion without reasonable suspicion that they had been involved in criminal activity. We reverse and remand.[1]

█ The trial court made no findings of fact. In reconstructing the sequence of events, therefore, we resolve disputed fact issues for which there is conflicting evidence as though the court resolved them in a way that was consistent with its legal conclusion. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). Under those principles, the facts of this case are as follows. Keizer police officers were inside an apartment executing a search warrant related to alleged drug offenses when they were told that two people—defendant and a companion—had approached the apartment, observed officers inside, walked away, and entered the vehicle that they had apparently arrived in. Two officers, Zavala and Johnson, immediately left the apartment to question the vehicle's occupants. They were joined by a third officer, Bamford. Zavala, according to his testimony, had a "hunch" that defendant and his companion had come to the apartment for drug-related business. He approached the driver's side and spoke with the driver, defendant's companion, at the same time that Johnson and Bamford approached the passenger side and spoke with defendant. Zavala and Johnson were in uniform and displaying badges; Johnson was wearing a "raid vest" with the word "police" in large letters across the front. The engine of the car was not running.

Zavala then told the driver why he was contacting her:

---

[1] Defendant also assigns error to the court's failure *sua sponte* to reject a crime laboratory report identifying the seized substance as methamphetamine. That assignment of error is controlled by our decision in *State v. Raney*, 217 Or App 470, 175 P3d 1024, *rev den*, 344 Or 671 (2008), where we rejected an indistinguishable argument. We do the same here without further discussion.

"I explained to her that we were executing a search warrant, that I was told that she had approached the door, her and her passenger. Because of this, we wanted to find out who they were, what interest they might have had with what we were doing there, or maybe they knew the individuals that—or individual that lived there at the apartment."

The driver told Zavala that she did not have identification, but she provided her name and date of birth.

As Zavala was talking to the driver, Johnson was asking defendant to identify himself. Defendant told Johnson that he had no identification, but that his name was Steve Tipton. Unfortunately for defendant, Johnson knew the Tipton family and knew that defendant was not who he claimed to be; he immediately suspected that defendant had committed the crime of giving false information to a police officer. ORS 162.385.

Each officer heard the other's conversation, and they decided—apparently simultaneously—to ask both of the car's occupants to step out of the vehicle. Zavala then led the driver to a position several yards away from the car. Johnson, meanwhile, told defendant that he knew he was not Tipton. Thus confronted, defendant gave Johnson an identification card with his correct name. Johnson ran a warrant check, discovered an outstanding warrant from Polk County, and told defendant that he was under arrest. Johnson then walked to where Zavala was talking to the driver. He asked for her permission to search the car. She signed a consent form. A search of the car yielded the evidence that was the subject of defendant's motion to suppress.

The trial court denied defendant's motion, ruling that the initial encounter between defendant, his companion, and the police was "a contact and not a stop." No stop occurred, according to the court, until after Johnson heard defendant give a false name, at which point the police had reasonable suspicion of criminal activity and could therefore lawfully detain defendant and his companion. Defendant was subsequently tried to a jury and convicted.

On appeal, defendant again argues that he and the driver were unlawfully stopped when the officers first

approached the car and asked the occupants to identify themselves. In response, the state contends that defendant cannot obtain suppression of the evidence because its discovery derived from a violation, not of his rights, but of the driver's. A one-sentence footnote in the state's brief adds, "The state, however, does not concede that the initial encounter between defendant and Officer Johnson was a stop; rather, it was a mere encounter."

We are not persuaded by the state's primary position. The state is correct that, under Article I, section 9, of the Oregon Constitution, the rationale behind suppressing unlawfully seized evidence is that suppression is necessary in order to restore the person whose right has been violated to the position he or she would have been in had the police acted lawfully. *State v. Davis*, 313 Or 246, 253-54, 834 P2d 1008 (1992). But in the present case, defendant does not take the position that the evidence should be suppressed because the driver's rights were violated.[2] Rather, he argues that, when the police in a single, indivisible act approached the car and identified themselves, indicated the purpose of their encounter, and asked *both* of the occupants for identification, the police violated *both* occupants' rights under Article I, section 9. That single violation, the argument continues, led to the discovery of the evidence, because if the police had respected the rights of the occupants, neither officer would have been in the position to question them, to extract consent from the driver, and to discover the contraband.

■      Defendant's argument, then, relies on the assertion that the police stopped him and the driver without reasonable suspicion that either was involved in criminal activity. The trial court ruled that the officers developed reasonable suspicion when Johnson recognized that the name defendant gave him was false. Neither party challenges that ruling and

---

[2] The state misperceives defendant's argument. According to the state, defendant argues "that, despite no violation of *his* constitutional rights, he should be entitled to suppression based on the alleged violation of the rights of the vehicle's owner, [the driver], who consented to a search of the car." (Emphasis in original.) Defendant, however, clearly argues, "The officers unreasonably, *i.e.* unlawfully, *seized defendant* and co-defendant[.]" (Emphasis added.) And, "[T]he officers did not have reasonable suspicion to believe that *defendant* and co-defendant had committed or were about to commit a crime. As a direct result of that stop, officers gained co-defendant's consent to search her purse and the car." (Emphasis added.)

we accept it. The issue, then, is whether, at that point in the encounter, defendant was seized for purposes of Article I, section 9.

■ ■ A "stop" requiring reasonable suspicion as a predicate occurs "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances." *State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991). A "stop" of the second variety occurs "whenever a person *subjectively* believes that a law enforcement officer significantly has restricted or interfered with that person's liberty or freedom of movement *and* such a belief is *objectively reasonable* under the circumstances." *State v. Toevs*, 327 Or 525, 535, 964 P2d 1007 (1998) (emphasis in original). A belief is "objectively reasonable" if "a reasonable person in [the] defendant's position could have believed that the officers significantly had restricted his [or her] liberty or freedom of movement." *Id.* at 536; *accord State v. Parker*, 227 Or App 231, 205 P3d 65 (2009); *State v. Ashbaugh*, 225 Or App 16, 25, 200 P3d 149 (2008), *rev allowed*, 346 Or 257 (2009).

■ We conclude that defendant was stopped before Johnson heard him provide a false name. By the time that occurred, defendant already knew that police were searching the apartment of one of his acquaintances. He saw three police officers, at least two of whom were in uniform, approach the car from both sides. One officer told the driver (within defendant's hearing) that the officers "were executing a search warrant, that [one officer] was told that [the driver] had approached the door, her and her passenger," and that, "[b]ecause of this, [the officers] wanted to find out who they were, what interest they might have had with what [the officers] were doing there, or maybe they knew the individuals that—or individual that lived there at the apartment." Johnson then asked defendant for identification. We conclude that, if defendant believed that his liberty was significantly restrained—that is, if he believed that he was not free to ignore the officers and leave the scene—his belief was eminently reasonable. We also conclude that the officer's conduct was "beyond that accepted in ordinary social intercourse," as

opposed to conduct that "would be perceived as * * * non-offensive * * * if it had occurred between two ordinary citizens." *Holmes*, 311 Or at 410. In "ordinary social intercourse" one *does not*, along with two friends, approach strangers who are sitting in a car and preparing to drive away, inform them that suspicious activity is afoot nearby, and ask them to identify themselves. Surely an ordinary citizen would consider such conduct offensive, regardless of the inquisitors' tone of voice.

Thus, defendant's belief that his freedom was significantly restrained when Johnson asked him for identification, if he had such a belief, was objectively reasonable. He and the driver were unlawfully stopped. We therefore remand for further factfinding on the motion to suppress. *See Ashbaugh*, 225 Or App at 28.[3]

Reversed and remanded.

**EDMONDS, J.,** dissenting.

The majority holds that defendant was stopped when officers approached him and his companion as they were seated in a parked car and asked them to identify themselves. For the reasons expressed below, I disagree with the majority's holding.

In his first assignment of error, defendant, the passenger in the parked car, argues that the trial court erred in denying his pretrial motion to suppress evidence that he claims was seized from the car in violation of Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution.[1] At the hearing on the motion to suppress, Officer Zavala testified that he received information from another individual assisting with the lawful search of an apartment that two people in a car had pulled

---

[3] The dissent takes issue with the "could have believed" formulation, implying that it originated in the majority opinions in *Ashbaugh* and *Parker*. In fact, this court adopted the phrase from the Supreme Court's opinion in *Toevs*.

[1] Article I, section 9, of the Oregon Constitution provides, in part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]" The Fourth Amendment to the United States Constitution provides, in part, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"

into the parking lot directly in front of the apartment, left the car, walked towards the front door of the apartment, looked inside, and then immediately turned around and returned to the parked car. Zavala further testified that, upon receipt of that information,

> "I immediately came out, along with Officer Johnson. I walked up to the driver's door of the vehicle and contacted the female driver [Grell] as she was sitting in the car."

When asked if the engine of the car was running, Zavala stated that the car had not been started. Zavala further explained that he identified himself as a police officer and explained to Grell why he was contacting them—"we wanted to find out who they were, what interest they might have had with what we were doing there, or maybe they knew the individuals that—or individual that lived there at the apartment." According to Zavala, the window of the car was "about three-quarters of the way up so [that] she could hear me as I was out speaking to her and I could hear her." Zavala also testified that when he heard that defendant had given a false name to Officer Johnson, he asked Grell to step out of the vehicle.

Johnson testified that he responded to the same information that Zavala had been given:

> "[Prosecutor]: Who did you contact?
>
> "[Johnson]: I contacted [defendant].
>
> "[Prosecutor]: How did you contact him?
>
> "[Johnson]: He was on the passenger side of the vehicle and I basically contacted him and asked for his name.
>
> "[Prosecutor]: How did you do that? Was his window down or did you knock on the window or how did that happen?
>
> "[Johnson]: You know, I believe his window was down partially.
>
> "[Prosecutor]: And did you identify yourself?
>
> "[Johnson]: Yes, I did.
>
> "[Prosecutor]: What did you tell him?

> "[Johnson]:   I told him I was Officer Johnson with the Keizer Police Department. I was wearing black media pants and a raid vest which is an outer shell vest that has the big letters of police in yellow across the front of it.

> "[Prosecutor]:   How did your contact go with this defendant?

> "[Johnson]:   I asked him for his name and he stated his name was Steve Tipton, and I recognized [defendant] but I couldn't put his name with his face because I had contacted him in the past, and I'd also known Steve Tipton, Jr. and Sr. who live in Keizer and kn[ew] that that was not him."

Believing that defendant's name was not Steve Tipton, Johnson asked defendant to step out of the vehicle and was able to correctly identify defendant from the contents of his wallet.

When defendant was correctly identified, he was arrested on an outstanding warrant. Then Johnson obtained Grell's consent to search the vehicle. The officers seized a white crystal substance, material consistent with packaging and delivery of a controlled substance, and other related items in the front half of the vehicle. The white crystal substance field-tested positive for methamphetamine. The officers also observed a duffel bag in the back of the vehicle, which defendant identified as belonging to him. No incriminating evidence was seized as the result of the search of the duffel bag.

In ruling on defendant's motion, the trial court found the testimony of the police officers credible and Grell's testimony about what occurred during the contact not credible. The trial court concluded that the initial contact between the officers and defendant did not constitute a restraint on defendant's freedom of movement and that, based on the officers' belief that defendant had given them a false name and the circumstances surrounding his presence at the apartment, they had reasonable suspicion to detain him and to investigate his true identity. Accordingly, the trial court denied defendant's motion to suppress. Subsequently, defendant was convicted after a jury trial.

On appeal, defendant asserts that the trial court should have granted his motion to suppress because a reasonable person would not have felt free to leave the parking lot under the totality of the circumstances. In response, the state argues, in part, that the initial encounter between Grell and defendant and the police officers did not violate their constitutional rights under Article I, section 9, and that Grell consented to the lawful search of her vehicle that resulted in the seizure of evidence that defendant seeks to suppress.[2]

Thus, the issue framed by the parties' arguments is whether Grell and defendant were illegally seized for purposes of Article I, section 9, at any point in time before Grell consented to the search of her vehicle. A voluntary consent to a search by a third party who exercises joint access or control over the object of a search renders the subsequent search of the object lawful because others exercising joint access or control have assumed the risk that one of their number might permit such a search. *State v. Carsey*, 295 Or 32, 39, 664 P2d 1085 (1983). Here, the commonly possessed area searched by the officers was the front interior area of the vehicle over which both Grell and defendant could exercise dominion and control. Defendant does not contend that Grell's consent was coerced or involuntary. Thus, unless Grell's consent to the search was tainted by a prior illegality, the search of the front of the vehicle and ensuing seizure of drug-related objects based on her consent were lawful. *State v. Hall*, 339 Or 7, 34-35, 115 P3d 908 (2005).

The question of whether Grell's consent was tainted by a prior illegality involves two inquiries on this record:

---

[2] The state also argues that defendant had no legally cognizable privacy interest in the contents of the vehicle and therefore is not entitled to obtain suppression of those contents based on an alleged violation of Grell's constitutional rights. Defendant denied any possessory interest in and knowledge of the objects that officers seized from the front portion of the vehicle. However, defendant's disclaimer does not prevent him from asserting a privacy interest in objects in the vehicle over which he was exercising joint possession or control. *See State v. Morton*, 326 Or 466, 469-70, 953 P2d 374 (1998) (holding that, where a defendant had been in possession of a container only moments before it came into the possession of the police, she was entitled to challenge the seizure of the container by the police under Article I, section 9); *see also State v. Finlay*, 170 Or App 359, 365, 12 P3d 999 (2000) (holding that the defendant could assert a privacy interest in credit cards on the center console of his vehicle even though he denied a proprietary interest in them).

First, did the officers seize Grell when they initially contacted her and defendant in the car? Second, the officers' testimony establishes that they asked Grell to get out of her vehicle in order to conduct an investigation regarding her presence at the scene. By that time in the encounter, she had unquestionably been seized—an exercise of police authority that implicated her rights under Article I, section 9, and required legal justification. Thus, this court must also determine whether that exercise of police authority in requesting her to get out of her car was based on a reasonable suspicion that she had committed or was about to commit criminal conduct. *Id.* at 16-17.

My disagreement with the majority begins with the question of whether the initial police contact between Grell and defendant constituted a seizure. In *State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991), the court held that a seizure of a person occurs under Article I, section 9, if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of liberty or freedom of movement, or whenever an individual believes that his or her liberty of movement has been restricted and such belief is objectively reasonable under the circumstances. Under that approach, not every public encounter between a police officer and a citizen will constitute a seizure. Rather, encounters between a police officer and a private citizen that are "free of coercion or interference with a citizen's liberty" do not implicate the individual rights guaranteed under the constitution. *State v. Amaya*, 336 Or 616, 627, 89 P3d 1163 (2004). Under *Holmes*, "law enforcement officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion in justification[.]" 311 Or at 410. As the *Holmes* court explained, "A street or public place encounter does not amount to an Article I, section 9 'seizure' merely because the encounter may involve inconvenience or annoyance for the citizen and the other party to the encounter is known to be a law enforcement officer." *Id.*

Based on the above principles, I would hold that Grell and defendant were not "seized" under Article I, section 9, when the officers approached them and sought to ascertain

their identity. In my view, no reasonable person in the circumstances of this case could have believed that the officer's request for their names was anything more than an insignificant intrusion prompted by their unexplained appearance at the scene of the execution of a search warrant.[3] The car in which Grell and defendant were seated was parked at the time that the officers approached, and its engine was not running. There is no evidence that the officers acted in a physical manner to restrain the vehicle or its occupants from leaving the vehicle or the parking lot. Moreover, the inquiry made by the officers regarding their identity was not inherently coercive in tone or content, nor did it objectively manifest an interference with their freedom, as some oral statements made under different circumstances by police officers might.[4] Finally, an inquiry by one private citizen of another regarding the person's name is a socially acceptable norm of ordinary social intercourse. A similar inquiry made by a police officer to a private citizen does not trigger the protections of Article I, section 9. *Id.* ("The pivotal factor is whether the officer, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner that would be perceived as a nonoffensive contact if it had occurred between two ordinary citizens.").

The next question is whether the officers had a reasonable suspicion that Grell and defendant were involved in criminal activity when they asked Grell to get out of the car—that is, after defendant gave the officers a false name. A reasonable suspicion is a "belief that is reasonable under the

---

[3] For purposes of this part of the analysis, I accept the "could have believed" formulation of the "part (b)" *Holmes* analysis. However, as explained later in the opinion, I do not agree that that formulation is a correct interpretation of *Holmes*.

[4] For example, Johnson did not command defendant to undertake any physical action or threaten him with police action if he did not orally reveal his identity. According to the record, Johnson's sole inquiry of defendant was an oral request for defendant to reveal his name, an inquiry that lacks any indicia of an exercise of police authority. In that respect, the circumstances of this case fall short of even the level of purported coerciveness that existed in *State v. Ashbaugh*, 225 Or App 16, 19, 200 P3d 149 (2008), *rev allowed*, 346 Or 257 (2009), where an officer asked the defendant whether she had anything illegal in her purse and whether he could search it after the defendant's identification had been unlawfully obtained from her and the police had checked for outstanding warrants. Nor did Johnson ask for defendant's date of birth or tell defendant he wanted to do a warrant check until after defendant had lied about his identity. *Cf. State v. Parker*, 227 Or App 231, 205 P3d 65 (2009).

totality of the circumstances existing at the time and place the peace officer acts[.]" ORS 131.605(5). At the time that they asked Grell and defendant to get out of the vehicle, the officers knew that (1) there existed probable cause for the search of the apartment for controlled substances; (2) Grell and defendant had intended to visit that apartment; (3) upon observing the execution of the search warrant, Grell and defendant had walked away "briskly" from the apartment; and (4) defendant had given a false name when requested for identification. Until defendant gave a false name to the officers, Grell's and defendant's presence at the site of the execution of the search warrant gave rise only to a reasonable inference that they were visitors to the apartment and did not create reasonable suspicion that they were involved in the criminal activities that were the subject of the search being carried out at that location. However, once defendant gave a false name to the officers—a furtive statement that indicated an intention to conceal his identify from the officers—that additional circumstance was enough to create a reasonable suspicion that defendant and Grell were somehow involved in the illegal activities in the apartment. Consequently, I would hold that the officers had a reasonable suspicion of criminal activity by the time that they asked Grell and defendant to get out of the car, and that Grell's consent to search the car was therefore not the product of any prior illegality.

Some final observations about this case and this court's Article I, section 9, jurisprudence: The majority's interpretation of Article I, section 9, as applied to the circumstances in this case, eviscerates the principle announced in *Holmes* that law enforcement officers remain free to approach citizens, seek their cooperation and assistance, and request information without being required to articulate a certain level of justification. Said otherwise, some contacts between officers and private citizens do not implicate Article I, section 9, because they constitute an insignificant intrusion on a person's freedom of movement and therefore are deemed reasonable. To be sure, some oral pronouncements by police officers carry with them a sense of coerciveness that objectively interferes with a citizen's freedom of movement. But Johnson's inquiry—simply asking defendant to identify himself—lacks the element of coerciveness that the Supreme

Court has held is necessary before Article I, section 9, is implicated. *See, e.g., Amaya,* 336 Or at 628; *cf. State v. Toevs,* 327 Or 525, 536-37, 964 P2d 1007 (1998) (concluding that a reasonable person in the defendant's position could have believed that his freedom of movement had been restricted because of a continuous manifestation of police authority after the defendant was told that he could leave).

The majority's analysis is further flawed by its application in this case of what it has previously characterized as a "type (b)" analysis in *State v. Ashbaugh,* 225 Or App 16, 200 P3d 149 (2008), *rev allowed,* 346 Or 257 (2009), and in *State v. Parker,* 225 Or App 610, 202 P3d 205, *adh'd to as modified on recons,* 227 Or App 413, 206 P3d 259 (2009). Under the majority view in those cases, the controlling inquiry is whether a reasonable person *could* have believed that he or she was not free to leave the presence of the officer. As applied to the circumstances of this case, the majority concludes that a reasonable person could believe that the mere request for identification—even though made after defendant came into contact with the police while they were executing a search warrant—constituted a significant restraint on his liberty. The resulting interplay between the "could have believed" formulation under *Holmes* and established precedent regarding "mere conversation" and community policing principles, creates an irreconcilable conflict for law enforcement officers to abide by and for courts to apply. Whether a person could believe that he or she is free to leave the presence of an officer will inevitably depend on a number of nonexclusive factors including the person's past personal experiences with police in general, the location of the encounter (rural, urban, etc.), cultural background, age, belief system regarding authority figures, and the circumstances under which the encounter occurs. Indeed, one person based on identical circumstances could believe he is free to leave while another person in precisely the same circumstances could feel constrained to remain in contact with the officer. Under the "could have believed" test, a law enforcement officer would have to be clairvoyant to successfully forecast when his or her contact with a private citizen could be unlawful.

The application of the "could have believed" test is further hampered by the fact that defendants generally do not testify in hearings on motions to suppress. This case is

illustrative of the problem that this court's formulation has created. Although the majority reaches its legal conclusion based on what it believes defendant knew about the surrounding circumstances, defendant did not testify, and the trial court made no findings about what defendant knew, saw, or heard. Indeed, the "could have believed" formulation requires courts, both trial and appellate, to draw inferences about the subjective belief of a defendant that are generally not available from the evidentiary record. That requirement results in an inconsistency with the standard in *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968) (appellate courts are bound by historical findings of trial courts when they are supported by substantial evidence and all matters upon which the evidence is in dispute are presumed to have been decided in a manner consistent with the ultimate conclusion), typically applied by appellate courts.

Consequently, I continue to believe that this court's application of the *Holmes* "part (b)" test to cases where a defendant does not testify is mistaken. The test is stated in *Holmes* as follows:

> "We hold that a 'seizure' of a person occurs under Article I, section 9, of the Oregon Constitution (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances."

311 Or at 409-10. The statement in *Holmes* is followed by the following footnote:

> "Any test intended to determine what constitutes a seizure of a person must be expressed in terms that can be understood and applied by the officer. The 'objectively reasonable' requirement in part (b) of our formulation furthers that purpose. An officer should only be responsible for anticipating the effects of his action on an objectively reasonable person, i.e., the officer must be able to treat the individual with whom he is dealing as an objectively reasonable person."

*Id.* at 410 n 19. Based on the above language, I believe that what the *Holmes* court intended to articulate in part (b) of its

test (perhaps, inartfully) is only applicable to address circumstances where a defendant testifies that he believed that his freedom of movement was being restrained by the officer's actions. The reasonableness of that belief is then tested by an objectively reasonable standard. In circumstances where a defendant does not testify, then only part (a) of the test applies. Here, only part (a) of the *Holmes* test applies because defendant did not testify at the suppression hearing. Under that test, I would hold that defendant's freedom of movement was not significantly interfered with by the mere act of an officer asking him to identify himself by name when that statement was unaccompanied by any other indicia of restraint.

Defendant also argues under the Fourth Amendment that the state does not point to any facts to justify the seizure of defendant and the driver. I am not persuaded by defendant's argument. A seizure of a person occurs under the Fourth Amendment when a reasonable person in the defendant's circumstances would not have believed that he or she was free to leave. *California v. Hodari D.*, 499 US 621, 624-28, 111 S Ct 1547, 113 L Ed 2d 690 (1991). Here, the officers did nothing to restrain Grell and defendant from leaving until defendant gave the officer a false name.

For all of the above reasons, I would affirm defendant's conviction.[5]

Landau, Wollheim, and Sercombe, JJ., join in this dissent.

---

[5] In his second assignment of error, defendant argues that the trial court erred when it received the crime laboratory report identifying the substance found in the vehicle as methamphetamine. I agree with the majority that the admission of the report is not error apparent on the face of the record in light of the fact that there exists an inference from the record that defendant consciously chose not to object when the report was offered by the state. *State v. Raney*, 217 Or App 470, 175 P3d 1024, *rev den*, 344 Or 671 (2008).