440 November 21, 2013 No. 56

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Petitioner on Review*,

*v.*

ALEM JONATHAN ANDERSON,
*Respondent on Review.*

(CC 05C51184; CA A135075; SC S058504)

On review from the Court of Appeals.*

Argued and submitted June 8, 2011; resubmitted January 7, 2013.

Anna Marie Joyce, Deputy Solicitor General, Salem, argued the cause for petitioner on review. With her on the brief were John R. Kroger, Attorney General, and Mary H . Williams, Solicitor General.

Ryan T. O'Connor, Senior Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause for respondent on review. With him on the brief was Peter Gartlan, Chief Defender.

Before Balmer, Chief Justice, and Kistler, Walters, Linder, and Baldwin, Justices.**

LINDER, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

Walters, J., dissented and filed and opinion in which Baldwin, J., joined.

_____

\* Appeal from Marion County Circuit Court, Dennis J. Graves, Judge. 234 Or App 420, 228 P3d 638 (2010).

\*\* Landau and Brewer, JJ., did not participate in the consideration or decision of this case.

**LINDER, J.**

This is one of three cases that we decide today in which we examine the legal standard for what constitutes a seizure under Article I, section 9, of the Oregon Constitution.[1] All three cases involve police contacts with individuals in which, at the outset of the contact, the officers asked the individuals for identification. In the first of the three cases, *State v. Backstrand*, 354 Or 392, 412-13, ___ P3d ___ (2013) (decided this day), we held that an officer's request for and verification of a person's identification are not acts that, in and of themselves, convert an encounter that is not a seizure for constitutional purposes into one that is. We further concluded in *Backstrand* that nothing in the accompanying circumstances of that case—*i.e.*, the context of the officer's contact with the individual, the content of the officer's request for identification, or the manner in which he made the request—resulted in a seizure of the defendant. *Id.* at 415-14.

In this case, we examine a different set of circumstances that surround the officers' request for and verification of identification. As we will explain, we likewise conclude in this case that the officers did not seize defendant and his companion by asking them for identification. We further conclude, however, that the actions that the officers took after asking for that identification did result in seizing defendant and his companion. Defendant does not dispute, however, that by then the officers had reasonable suspicion for his seizure. Consequently, we reverse the decision of the Court of Appeals and affirm the trial court judgment.

## BACKGROUND

The circumstances that gave rise to this case occurred when several police officers were executing a night-time search warrant at an apartment. The officers were members of a "Community Response Unit" that is specially charged with investigating suspected drug activity in local neighborhoods in response to citizen complaints. They were

---

[1] The other two cases are *State v. Backstrand*, 354 Or 392, ___ P3d ___ (2013), and *State v. Highley*, 354 Or 459, ___ P3d ___ (2013). We allowed review in all three cases after having held them in abeyance pending our decision in *State v. Ashbaugh*, 349 Or 297, 244 P3d 360 (2010).

looking for evidence that the person who resided at the apartment, Wilson, was involved in drug dealing.

While police were searching Wilson's apartment, a car pulled into the parking lot directly in front of it. By then, police had found evidence in the apartment of illegal drug activity. Two people got out of the car, walked up to the apartment, and "peeked" inside the open front door. When they saw the officers searching the living room, the two immediately turned around, walked "briskly" back to the car, and got back inside. Officer Zavala, who was immediately informed about their approach and quick retreat, left the apartment to contact them. Two other officers, Officer Johnson and Detective Bamford, followed Zavala. When the three officers reached the car, it was still parked, the engine was not running, the windows were partially rolled down, and the two were sitting inside. Zavala approached the driver, while Johnson and Bamford approached defendant, who was sitting in front on the passenger's side. Zavala was wearing his badge and was in uniform. Johnson was wearing a "raid vest," which is an outer vest with the word "police" displayed in large yellow letters across the front.[2]

Zavala explained to the driver that the officers were executing a search warrant at the apartment and that they were contacting them "to find out who [defendant and the driver] were, what interest they might have had with what [the police] were doing there, or maybe they knew the *** individual that lived there." The driver immediately responded that she knew Wilson and that she and defendant were there to "meet with" him and his girlfriend.

Zavala asked the driver for identification. She denied having any but gave Zavala her name and date of birth. As Zavala talked to the driver, Johnson asked defendant for identification. Defendant, too, denied having any identification, but told Johnson that his name was Steve Tipton. Johnson, however, knew Steve Tipton, who was a member of the Tipton family that lived in the area. Johnson also recognized defendant from past "patrol contacts." Although Johnson could not "put [defendant's] name with his face,"

---

[2] The record does not reflect whether Detective Bamford was in uniform.

Johnson was sure that defendant was not Steve Tipton. Believing that defendant was lying about his name, Johnson responded by telling defendant that Johnson knew the Tipton family, knew Steve Tipton, and "you're not him, I recognize you."

Johnson then asked defendant to step out of the car, which defendant did. Johnson did so both to better determine if defendant had any identification on him and for officer safety reasons. In Johnson's 15 years of experience as a police officer, when a person gives him a false name, that person is trying to hide his or her identity "for a reason," such as to avoid arrest on an outstanding arrest warrant or otherwise to evade detection in connection with some kind of illegal activity. As Johnson explained: "If he's lying to me at this point or not giving me a truthful name, I want to make sure that *** I can see his hands[.]"

Zavala, who had heard the conversation between Johnson and defendant about the false name, asked the driver to step out of the car as well, and she did so. Based on the birth date that she had given him, Zavala realized that the driver might be 17 years old and, therefore, a minor. From Zavala's observations, the driver seemed nervous and unsure of herself, and was watching defendant for cues as to whether she should say anything to the officers. After the driver stepped out of the car, Zavala moved her several yards away from the car and out of defendant's "earshot," thinking that she might be more willing to "let us know what exactly is happening" or produce identification if she did not have to talk in front of defendant.

As Zavala was getting the driver out of the car, Johnson again asked defendant if he had any identification. Defendant immediately admitted that he did and said that it was in his wallet, which was in his pocket. Defendant produced the identification for Johnson. Johnson then ran a warrant check on defendant and, within "a couple of minutes," determined that defendant was wanted on an outstanding arrest warrant. Johnson placed defendant under arrest. He then went over to where Zavala and the driver were standing and interrupted their conversation to ask the driver for consent to search the car and its contents. Zavala

left them to call dispatch and verify the information that the driver had given him about her identity and the car's registration (the driver had said that she did not own the car). The information appeared to be correct. Zavala also determined that there were no warrants or "holds of any kind" on the driver.

Johnson, meanwhile, told the driver that he would like to search the car for controlled substances and weapons. He asked her, as the person who had custody and control of the car, if she "had an issue with that." She said that she did not. Johnson then read her a "consent to search" card and asked her if she would sign it. She did. The driver identified where her purse was in the car, and Zavala, who by then had rejoined Johnson and the driver, retrieved it. Zavala searched the purse pursuant to the consent that the driver had given Johnson. In the purse, Zavala discovered a glass pipe with white residue that he believed was a controlled substance. Zavala, therefore, took the driver into custody at that point and proceeded to search the car. In the car, the officers discovered methamphetamine on the floor behind the passenger's seat, along with drug-related paraphernalia (*e.g.*, glass pipes, packaging materials, a straw, tweezers), money, and weapons found throughout the car. In a duffle bag in the rear of the car, officers found, along with some personal items, a two-way radio, a police scanner, and a stun gun. Defendant acknowledged to the officers that the duffle bag was his but asserted that the drugs belonged to the driver. The driver told the officers that the drugs seized from the car belonged to defendant.

Defendant was charged with delivery of methamphetamine. Before trial, he moved to suppress "any and all evidence" that had been discovered during the encounter. In support of his motion, defendant argued that the officers had unlawfully stopped and detained him, and that the evidence obtained in the search was a product of that illegal stop. Defendant also argued that the driver's consent had not been given voluntarily. At the hearing on the motion, relying on the events as described by the officers, the state argued that the officers' initial contact with defendant and the driver was not a stop. By the time that the officers asked the two to step out of the car, defendant had lied about who

he was, which the state urged gave the officers reasonable suspicion to detain him by at least that point, especially in combination with the surrounding circumstances (*i.e.*, that the two had approached a "drug house," saw police, and then quickly left). As to the voluntariness of the driver's consent, the state urged that the officers' testimony was "extremely different" from that of the driver, that the driver was not a credible witness, and that, if the officers' testimony was believed, the driver's consent was voluntary.

In response, defense counsel argued that the stop occurred as soon as the officers approached the car because, according to the driver's testimony, the driver had started the car and was prevented from leaving when one officer stood behind it to block it. Defendant argued, alternatively or additionally, that the officers stopped defendant and the driver by having them get out of the car without reasonable suspicion—at that point—that defendant and the driver were involved in criminal activity. Defense counsel further urged, again relying on the driver's testimony, that the officers also coerced the driver into consenting to the search by repeatedly requesting consent while she was unlawfully detained and eventually obtaining her consent involuntarily only after telling her that, if she did not consent, she would be put in jail.[3]

In denying defendant's motion, the trial court expressly found that the driver was not credible and that both officers were. With that finding, the trial court implicitly rejected defendant's argument that the driver had not voluntarily consented to the search. The trial court then resolved the remaining issue—*viz.*, whether defendant had been unlawfully stopped. In doing so, the trial court found that, "at the time the officers first approached the [d]efendant

---

[3] The driver's testimony differed significantly from that of the officers. According to the driver, by the time that the officers approached the car, she had the engine running, was in reverse gear, and was preparing to leave. She said that one the officers stood behind the car to prevent her from backing up and that she would have had to hit him to leave. She also said that she was first asked to consent to the search while still sitting in the car and that she had told the officer that she was could not consent because she was a minor and the car belonged to her uncle. After getting out of the car, the officers asked her twice more for consent, and each time she refused. She consented to the search only after one officer told her that they could search her car based on the search warrant for the apartment and that, if she did not consent, "he could take [her] to jail."

and asked his name, [d]efendant was a passenger in a parked motor vehicle without the engine running." The trial court concluded, based on those factual findings, that the initial contact was "not a stop." The trial court further concluded that, once defendant gave the officers a false name, the officers had reasonable suspicion to detain defendant, "given the circumstances which took the officers to the location[.]" Based on those findings and conclusions, the court denied the motion. The case went to trial, and a jury found defendant guilty as charged.

Defendant appealed, assigning error to the denial of his motion to suppress. In support of the assigned error, defendant abandoned his claim that the driver's consent had been involuntary. He instead argued only that the officers' actions constituted a stop "when they stood at the windows of the car and asked for identification so that they could run warrants checks" on defendant and the driver. At that point, defendant urged, the officers lacked reasonable suspicion that either defendant or the driver was involved in criminal activity. Defendant argued that, "[a]s a result of the unlawful stop, defendant provided the officer with a false name[,]" which in turn caused the officers to have the two step out of the car and to ask the driver for consent to search her purse and the car. Based on that sequence, defendant asserted that the driver's consent was a direct result of the unlawful stop and that all evidence against defendant obtained from the search should be suppressed. In response, while expressly declining to concede that the initial encounter between the officer and defendant was unlawful, the state principally argued that defendant did not have a cognizable privacy interest in the general contents of the car and therefore could not challenge the lawfulness of the search.

The Court of Appeals, sitting *en banc*, reversed in a split decision. The majority rejected the state's argument that defendant lacked a cognizable interest in the car and its contents. *State v. Anderson*, 231 Or App 198, 202 n 2, 217 P3d 1133 (2009), *adh'd to on recons*, 234 Or App 420, 228 P3d 638 (2010). The majority then determined that the driver and defendant were seized when the officers approached the parked car, explained that they had been executing a search warrant at the apartment, and asked

the driver and defendant for identification. *Id.* at 203. The majority reasoned that, under the circumstances, defendant reasonably could have believed that his liberty was significantly restrained when the officers asked him for identification. *Id*. at 204. Under that court's then-current case law, if defendant also subjectively believed as much, he was seized.[4] Because defendant had not given the officers a false name by then, thus giving the officer reasonable suspicion to stop him, the majority concluded that the seizure was unlawful. *Id*. at 203-04.

Four judges dissented, disagreeing that the officers seized the occupants of the car during the initial encounter by explaining the reason for the contact and asking for identification. *Id*. at 208-09 (Edmonds, J., dissenting). The dissent further concluded that the encounter rose to the level of a seizure when the officers asked defendant and the driver to step out of the car, but at that point, the seizure was justified by reasonable suspicion. *Id*. at 208, 210. The dissent, accordingly, would have affirmed the trial court's judgment. *Id*. at 213.

The state sought review of whether, as the Court of Appeals majority had concluded, defendant was seized for purposes of Article I, section 9, when the officers contacted the car's occupants and asked them for identification. The state's argument on that issue tracks the reasoning of the dissent in the Court of Appeals—*viz*., no seizure occurred before defendant and the driver were asked to get out of the car, at which point the officers had reasonable suspicion to detain them.[5] In response, defendant urges us to adopt the

---

[4] Relying on its decision in *State v. Ashbaugh*, 225 Or App 16, 28, (2008) *rev'd*, 349 Or 297, 244 P3d 360 (2010), the Court of Appeals remanded the case to the trial court for findings regarding whether defendant in fact believed that his freedom was significantly restrained at that point. *Anderson*, 231 Or App at 204. Subsequently, in *Ashbaugh*, we explained that a seizure for purposes Article I, section 9, is not determined by the subjective impressions of the person interacting with the officer. 349 Or at 316. The determinative question is therefore not whether defendant reasonably *could* have believed that the officers significantly restricted his liberty, but rather whether a reasonable person in defendant's circumstances *would* believe that to be the case.

[5] Preliminarily, the state asks us also to further revise the two-part "seizure" test that we recently modified in *Ashbaugh*. 349 Or at 316. We declined the state's invitation to revisit that test in *Backstrand* because, as the parties agreed, the case did not adequately implicate the prong of the test that the state asks us

reasoning of the Court of Appeals majority and conclude that defendant and the driver were unlawfully seized when the officers first requested their identifications. We turn to the parties' arguments in those regards.[6]

## ANALYSIS

In *Backstrand*, also decided today, we outline at some length the principles that guide the analysis of what constitutes a seizure for purposes of Article I, section 9, and

to reconsider. 354 Or at 399 n 8. Likewise, the parties here also agree that this case does not implicate that prong. We therefore decline the state's invitation in this case as well.

[6] The parties' arguments also suggest a further issue, one that we conclude has not been presented and preserved in this case. In its petition for review, the state urged that the Court of Appeals "implicitly held that defendant could establish exploitation—or 'but for' causation of the discovery of the evidence—not by reference to the alleged unlawful seizure of [defendant's] person, but with respect to the allegedly unlawful seizure of *the driver*." (Emphasis in original.) The state petitioned the Court of Appeals for reconsideration to address that perceived implicit holding, asserting that defendant could not seek suppression based on a *Hall*-type claim that the officers exploited an unlawful stop of the driver to obtain her voluntary and otherwise lawful consent. *See generally State v. Hall*, 339 Or 7, 24-25, 115 P3d 908 (2005) (discussing suppression of derivative evidence based on exploitation of initial illegality). The Court of Appeals declined to consider the state's arguments in that regard, declaring that they had not been raised either in the state's brief or at trial. *Anderson*, 234 Or App at 424.

In its merits brief to this court, the state does not further address that exploitation issue. Defendant, for his part, analyzes at some length whether—separate and apart from whether defendant was unlawfully stopped—the officers unlawfully stopped the driver at any of a series of points in time, ranging from when Zavala first approached her while sitting in the car to when Johnson asked her for consent to search. Defendant, too, however, does not address whether defendant is entitled to suppression based on an argument under *Hall* that the driver's consent was tainted, not by exploitation of a violation of defendant's rights, but by exploitation of a violation of the driver's rights.

That novel exploitation issue, however, is not properly before us. As we have described, defendant made only two arguments at trial. First, he argued that he and the driver were illegally stopped as soon as the officers approached the car and that the driver's consent was a product of the illegality that was common to both the driver and defendant. Second, he argued that the driver's consent was involuntary. Defendant did not argue that, if he was lawfully stopped and the driver was not, the driver's voluntary consent was the tainted product of her separate illegal stop and defendant was entitled to suppression on that basis. In the Court of Appeals, defendant abandoned any argument about the voluntariness of the driver's consent, and he did not challenge the trial court's ruling that the officers had developed reasonable suspicion when defendant gave Johnson a false name. Thus, the Court of Appeals described the only issue before it as whether, "at that point in the encounter, *defendant* was seized for purpose of Article I, section 9." *Anderson*, 231 Or App at 203 (emphasis added). That, likewise, is the only issue before us on review.

in particular, when a police request for information or cooperation results in such a seizure. 354 Or at 398-413. In doing so, we reaffirm certain propositions that our case law has endorsed over the last several decades. Key among those propositions, for purposes of the three related stop cases decided today, is that not every police-citizen encounter rises to the level of a seizure for constitutional purposes. Rather, as this court has long held and frequently reaffirmed, "law enforcement officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful." *State v. Holmes*, 311 Or 400, 410, 813 P2d 28 (1991).[7] That is true even though the person approached may be discomforted by an officer's inherent authority as such and, for reasons personal to the individual, feel inclined or obliged to cooperate with the officer's request. *Backstrand*, 354 Or at 400-02. For an encounter between an officer and a citizen to be a seizure under Article I, section 9, the officer must add to those inherent pressures by either physically restraining the citizen's liberty in a significant way or engaging in a "show of authority" that, explicitly or implicitly, reasonably conveys to the person a significant restriction on the person's freedom to terminate the encounter or otherwise go about his or her ordinary affairs. *Id.* at 402; *see also Holmes*, 311 Or at 410 ("physical contact does not transform the encounter into a 'seizure' if it is a normal means of attracting a person's attention (*e.g.*, policeman tapping citizen on the shoulder at the outset to get a citizen's attention)").

We, therefore, reaffirm in *Backstrand* that verbal police inquiries are not, by themselves, seizures. *Id.* at 403 (citing propositions from *State v. Rodgers/Kirkeby*, 347 Or 610, 622, 624, 227 P3d 695 (2010)). "Something more" is required. *Id.* That something more can be "the content or manner of questioning, or the accompanying physical acts by the officer, if those added factors would reasonably be

---

[7] That principle was immediately reaffirmed following *Holmes* in *State v. Gerrish*, 311 Or 506, 513, 815 P2d 1244 (1991), and most recently in *State v. Watson*, 353 Or 768, 774, 305 P3d 94 (2013). Other cases reaffirming *Holmes* in the interim are too numerous for citation.

construed as a 'threatening or coercive' show of authority requiring compliance with the officer's request." *Id.* (citing *State v. Ashbaugh*, 349 Or 297, 317, 244 P3d 360 (2010)). If an officer does not, by words or conduct, convey such a show of authority, the officer remains free to contact or otherwise engage a citizen to request information and cooperation or to impart information without justification. *Id.*

With those precepts reaffirmed, *Backstrand* resolves an issue that this court has not before decided: Whether an officer's request for and verification of a person's identification are actions that, in and of themselves, convert an encounter that is not a seizure for constitutional purposes into one that is. We hold in *Backstrand* that they do not. "Asking for identification," we observe, "is exactly the kind of interaction that *Holmes* contemplated—a request for information and a citizen's cooperation." *Id.* at 409. Thus, a mere request for identification made by an officer in the course of an otherwise lawful police-citizen encounter is not sufficient, in and of itself, to result in a seizure. *Id.* at 409-10. Nor does an officer's action of verifying a person's identification, without more, convert the encounter into a seizure. *Id.* at 413. As the decision in *Backstrand* explains:

"We see no principled basis for concluding that, when an officer checks the validity of a proffered identity or piece of identification, such an action *per se* conveys to a reasonable person—who is not otherwise restrained and who has willingly tendered the information to the officer—that the officer is now exercising his or her authority to coercively restrain the person's liberty or freedom of movement. To be sure, as we have already discussed, a person tendering identification to an officer may not subjectively feel comfortable refusing the officer's request. Instead, for any number of personal reasons or instincts, the person may be unwilling to decline the officer's request. Those internalized motivations and feelings are not the test for whether there is a seizure under Article I, section 9. A person who turns over identification to a law enforcement officer reasonably would expect that the officer will take steps to verify its validity. For the officer to do so does not objectively convey an exercise of the officer's authority to restrain the person's liberty or freedom of movement. The circumstance is akin to when a person gives valid consent to search. Part and parcel with

giving consent is a reasonable person's expectation that he or she will likely either need or want to stand by while the officer performs the search. The person who waits while a consent *search* is completed is not thereby *seized* for purposes of Article I, section 9. So, too, with a person who, in a noncoercive setting, gives an officer his or her identification for the officer's examination. The fact that the officer conducts that examination is not, in and of itself, a basis to conclude that the otherwise noncoercive encounter has become a *coercive* restraint on the person's liberty."

*Id*. at 412-13 (emphasis in original) (footnote omitted).

Our analysis in this case begins with that holding from *Backstrand*. The question framed by the parties' arguments is whether the officers seized defendant and the driver by walking up to them in the car, explaining why the officers were contacting them, and asking them for identification. If defendant was seized at that point, the seizure was unlawful. At that point, as the trial court concluded and we agree, the officers lacked reasonable suspicion to temporarily detain either the driver or defendant.[8] If, however, defendant was not seized at that point, this case effectively ends with that conclusion. The trial court found that the officers seized defendant by asking him to get out of the car, but also found that by then defendant had given them a false name. The trial court concluded that, under the circumstances, the false name that defendant had provided to the officers gave rise to reasonable suspicion to detain him further. Defendant did not challenge the trial court's reasonable suspicion conclusion on appeal to the Court of Appeals, see 354 Or at 449 n 6, and does not do so—nor could he—now. Thus, the question before us is focused specifically and narrowly on the officers' initial contact with defendant and the driver.

Factually, that contact—up to and including the request for identification—was both brief and limited. Zavala, in a matter of seconds, explained to the driver what the officers were doing at the apartment and why the officers were interested in talking to them. Then, Zavala asked

---

[8] The trial court expressly found that the officers developed reasonable suspicion when defendant identified himself with a name that one officer immediately recognized as false. The state did not challenge that conclusion on appeal. *Anderson*, 231 Or App at 202-03. Nor does it challenge it before this court.

the driver for identification, while Johnson asked defendant for the same. Under *Holmes*, the officers did not seize the occupants of the stopped car by merely approaching them to explain why they had followed them from the apartment and why they wanted to talk to them. 311 Or at 410. Nor, under *Backstrand*, did the contact become a seizure because the officers then asked them for identification. A request for identification, in and of itself, is a request for information or cooperation of the kind that falls outside of the constraints of Article I, section 9. *Backstrand*, 354 Or at 409-10.

The remaining question is whether the circumstances as a whole transformed the encounter into a seizure despite those conclusions. In particular, the question is whether the content of the officers' requests, the manner in which they were made, or the overall context of the contact elevated the encounter to the level of a seizure by conveying to defendant and the driver that the officers would not allow them to leave. The record does not suggest, however, that the officers' tone or manner were overbearing or controlling, such that what otherwise were mere verbal exchanges were, in fact, something more. Nor was the content of the brief verbal exchange coercive. Zavala's explanation of the officers' reasons for the contact and the officers' requests for identification informed defendant and the driver that the officers were interested in why they had come to the apartment and what they knew about Wilson's activities. That information objectively conveyed possible suspicion that the driver and defendant could be involved in criminal activity related to the apartment, but they equally conveyed that the officers were interested in whatever information the two might be able to provide. In all events, by those brief verbal exchanges and inquiries alone, the officers did not communicate an exercise of authority of the kind required for a seizure—*i.e.*, authority to restrain. *See Backstrand*, 354 Or at 413-16 (officer's request for identification, even though it might convey concern that defendant was under age in adult book store and might not be permitted to remain inside, was not sufficient, without more, to seize defendant); *Ashbaugh*, 349 Or at 317 (after arresting defendant's husband, officer returned to defendant, asked if she had anything illegal in her purse, and asked for consent to search; encounter not a

seizure). The officers were uniformed, but took no physical action other than to approach the parked car, and the officers requested no physical action from defendant and the driver at that point. Under those circumstances, the fact that there was one more officer present than there were people in the car would not cause a reasonable person seated in the car to believe that the officers were significantly restricting his or her liberty. Rather, the circumstances here fall into the large category of cases in which police officers approach and question persons sitting in parked vehicles without triggering constitutional protections against unreasonable seizures. *See* Wayne R. LaFave, 4 *Search and Seizure* § 9.4(a), 576 (5th ed 2012) (citing cases).[9]

Although the parties disagree whether the officers seized the driver and defendant when they approached them in the parked car and requested their identifications, they concur that the two were seized when the officers asked them to get out of the car. Given the totality of circumstances, including Johnson's expressed disbelief in defendant's identification of himself as Steve Tipton, a reasonable person would take the officers' "requests" to exit the car to be directives and would believe that his or her liberty was significantly restrained. *See State v. Jacobus*, 318 Or 234, 236, 240-41, 864 P2d 861 (1993) (officer seized the defendant by repeated "requests" that the defendant "step out" of a parked vehicle). We therefore agree with the parties that, given the attendant circumstances, defendant was seized at that point for purposes of Article I, section 9.

---

[9] Defendant relies on two of our prior decisions, *State v. Warner*, 284 Or 147, 585 P2d 681 (1978), and *Rodgers/Kirkeby* to argue that the officers' request for identification here constituted a seizure. We discussed both cases at some length in *Backstrand*. 354 Or at 410, 412 (discussing *Warner*) and 406-07 (discussing *Rodgers/Kirkeby*). *Warner* involved the "something more" than a mere request for identification that this case and *Backstrand* lack. There, police made it clear that the defendant and his companion were the central focus of their criminal interest, and then asked for his identification, removed it from him physically, and advised him that he could "be on [his] way" as soon as they could "clear this matter up." *Warner*, 284 Or at 150-52. In *Rodgers/Kirkeby*, the defendants had been lawfully stopped, and thus already seized. The officers completed their investigations, but then continued questioning the defendants. In that distinctive context, such conduct meant that the officers' verbal inquiries conveyed to the defendants that they remained subject to the officers' restraint, and thus were seized for constitutional purposes. 347 Or at 627-28. Just as we concluded those cases were distinguishable in *Backstrand*, we conclude they are distinguishable here.

But as we earlier observed, the trial court concluded that, once defendant gave a false name to Johnson, the officers had reasonable suspicion to detain him. Defendant did not challenge that conclusion in the Court of Appeals, and he does not—and cannot, having not done so in the Court of Appeals—challenge the trial court's reasonable suspicion determination now.[10] Consequently, at the point that defendant was first seized, there is no dispute that the officers had reasonable suspicion for the seizure. The seizure was, therefore, lawful.

## CONCLUSION

The officers did not seize the driver and defendant by walking up to the two in a parked car, inquiring into their connection to an apartment that they had just approached, and asking the two for their identifications. Those questions did not constitute a sufficient show of authority to cause a reasonable person under the circumstances to believe that his or her liberty was significantly restrained and, therefore, did not constitute a "seizure." The encounter rose to the level of a seizure only once the officers asked the driver and defendant to step out of the car. Defendant, however, has not challenged the trial court's conclusion that the officers at that point had reasonable suspicion for the seizure. Because the seizure was lawful, the trial court correctly denied defendant's motion to suppress the items discovered in the car.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

**WALTERS, J.,** dissenting.

I respectfully dissent. For the reasons I explain today in *State v. Backstrand*, 354 Or 392, ___ P3d ___ (2013) (Walters, J., concurring in the judgment), it is my view that when an officer requests an individual's identification in

---

[10] The trial court did not specify whether it found reasonable suspicion based on either or both of the grounds that Johnson identified, which were that he believed that defendant had committed the crime of giving a false name to an officer, ORS 162.385 (crime to give false information to an officer for the purpose of the officer's arresting the person on a warrant or issuing a citation), and that, in Johnson's training and experience, people usually give false names to avoid being arrested on an outstanding warrant or to avoid detection for criminal activity.

circumstances in which a reasonable person would believe that he or she is being subjected to a criminal investigation and therefore must respond, provide the identification, and remain until the officer completes the immediate investigation, the officer restrains the individual's liberty and effects a seizure under Article I, section 9, of the Oregon Constitution.

In this case, officers were searching an apartment as part of a criminal drug investigation when defendant came to the open door of the apartment. When defendant saw the officers searching the apartment, he walked from the apartment to the car in which he had arrived and got into the passenger's seat. Three officers approached the car; two stood on one side of the car and the other stood on the opposite side. One officer was in uniform, another was wearing a raid vest. One officer explained that the officers were executing a search warrant at the apartment, that the officer had been told that the driver and defendant had approached the door of the apartment, and that the officer wanted to know "who they were," and "what interest they might have" with what the officers were doing. That officer then asked the driver for identification; another officer asked defendant for identification.

The majority recognizes that the officers objectively conveyed "possible suspicion" that defendant "could be involved in criminal activity related to the apartment," but also suggests that the officers "equally conveyed that [they] were interested in whatever information [defendant and the driver] might be able to provide." 354 Or at 453. The majority then concludes that those "brief verbal exchanges" did not "communicate an exercise of authority of the kind required for a seizure—*i.e.*, authority to restrain." *Id*. at 453. Neither, the majority concludes, did the fact that three officers surrounded the car. The majority reasons that the officers requested no physical action from defendant and that there was only one more officer present than there were people in the car. *Id*. at 454.

Although the majority recites the requirement that the court consider the circumstances as a whole, *id*. at 453, the majority does not wrestle sufficiently with the combined

effect that the officer's communication and conduct would have on a reasonable person. When considered in combination, the facts that the officers were in the process of conducting a drug investigation, that the officers indicated that they considered defendant a potential suspect in that investigation, and that the officers asserted physical authority over defendant by surrounding the car in which he was seated, add up to a show of authority that would have conveyed to a reasonable person that he was the subject of a criminal investigation and therefore was not free to leave or go about his ordinary business until the immediate investigation was completed. *Id*. at 455. *See [State v. Thompkin](#)*, 341 Or 368, 378-79, 143 P3d 530 (2006) (officers seized defendant, a car passenger, when they requested and retained her identification, conducted a records check, and questioned her about drugs). The majority's contrary conclusion is, in my view, wrong.[1]

The reasoning that the majority uses to reach that conclusion also illustrates two of the points that I seek to make in my concurrence in *Backstrand*. First, in this case, the majority correctly focuses on whether the officers' communication and conduct would cause a reasonable person to believe that his or her liberty was restrained, and, in doing so, calls attention to the majority's different focus in *Backstrand*. In this case, the majority does not consider whether a reasonable person in the circumstances presented would *expect* the officers' conduct or consider it *appropriate*, or whether the officers' investigation continued for more than a *reasonable* period—considerations that the majority considered determinative in *Backstrand*. 354 Or at 415-16. If such considerations were relevant to whether the officers seized defendant, then, in this case, they would demonstrate that the officers engaged in conduct that a reasonable person would not expect or consider appropriate if engaged in by others. The majority's failure to address those considerations in this case demonstrates either that those considerations are not relevant to determine whether a seizure has

---

[1] I recognize that the majority goes on to consider the officers' actions after obtaining defendant's identification and concludes that those actions resulted in a seizure. 354 Or at 442. I disagree only about the point in time at which the seizure occurred.

occurred or, if they are relevant, that the majority is unwilling to consider them in an instance in which they demonstrate that a seizure did occur.

Second, in deciding that an individual who is sitting in a parked car surrounded by officers who could be investigating his involvement in drug activity is free to leave and need not remain and respond to the officers' inquiries, the majority invites conduct that officers do not expect or intend an individual in that circumstance to take. If the individual were to make a move toward the door of the car or begin to exit, the officers might reasonably believe that their safety was threatened. The majority's decision encourages the public to act in ways that increase rather than reduce the risk of conflict.

I respectfully dissent.

Baldwin, J., joins in this dissenting opinion.