Submitted April 24, reversed and remanded June 12, 2013

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

STACY LYNN DIERKS,
*Defendant-Appellant.*

Multnomah County Circuit Court
110545450; A149290

306 P3d 653

Peter Gartlan, Chief Defender, and Morgen E. Daniels, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and David B. Thompson, Senior Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

HADLOCK, J.

## HADLOCK, J.

Defendant appeals a judgment finding her in contempt for having violated the terms of a no-contact order issued by a Washington court. Defendant raises three assignments of error, arguing that the trial court erred by denying her motion to suppress, by overruling a hearsay objection that she made during the bench trial, and by purportedly applying "the wrong legal standard when it 'instructed' itself that the state did not have to show that defendant willfully violated the [Washington] court's order." Because it is dispositive, we address only defendant's first assignment of error, in which she argues that the trial court erred in denying her motion to suppress evidence of her identity that a police officer discovered after he initiated conversation with defendant and her companion as they sat in a parked car. We review the trial court's ruling for legal error, "deferring to the trial court's explicit and implicit findings of historical fact if there is constitutionally sufficient evidence in the record to support them." *State v. Salvador*, 237 Or App 424, 426, 241 P3d 324 (2010). Applying that standard of review, we reverse.

We describe the facts consistently with the trial court's findings, which the evidence supports. On the day in question, Gresham Police Officer Barrett was on patrol in the Rockwood neighborhood, which he described as "a high-crime, high-drug, high-gang area." Barrett spotted a single car parked in a small parking lot where, in the past, he had encountered people who were engaged in drug deals. Barrett, who was in uniform, pulled his marked patrol car into the parking lot; as he arrived, he saw the two occupants of the other car "look up at [him] and realize [he] was there." Barrett parked without blocking the other car and without turning on his emergency lights. He then approached the parked car and spoke with defendant, who appeared to be the driver, and defendant's passenger, explaining that they were in "a very high-drug, high-crime area." Barrett asked defendant and the passenger whether they had seen anything suspicious; he also asked what they were doing. Defendant and the passenger told Barrett that they were waiting for a friend.

Barrett then asked defendant and the passenger for their names. Defendant said that her name was Stacy Lynn Burke and that she was licensed to drive in Washington, but did not have the license with her. The passenger responded to Barrett's inquiry by identifying himself and providing Barrett with his driver's license. Barrett returned to his car and ran the name Stacy Lynn Burke through the Law Enforcement Data System (LEDS) in both Oregon and Washington, but nothing came up in either state. When Barrett ran the passenger's name, he testified, he discovered that the passenger "had a valid restraining order against someone by the name of Stacy Lynn Dierks, * * * which was very similar to Stacy Lynn Burke * * *." At that point, Barrett thought that defendant had lied to him about her identity.

Because Barrett thought that defendant might be the Stacy Lynn Dierks against whom the no-contact order had issued, he asked if she had any photo identification with her. As defendant looked through her purse, Barrett saw her twice pass by a paper copy of a Washington driver's license. Barrett pointed that out to defendant, who then handed him the document, which reflected her true identity.

After she was charged with contempt for having violated the no-contact order, defendant moved to suppress the evidence of her identity that Barrett had obtained during the parking-lot encounter, arguing that Barrett had seized her by asking for her name and performing a warrants check.[1] Under those circumstances, defendant argued, a reasonable person would not have felt free to leave, particularly given the officer's retention of the passenger's license while he checked LEDS. The state responded that Barrett did not stop defendant simply by questioning her and asking for her identification. In any event, the state argued, Barrett had reasonable suspicion that defendant had committed a crime (providing false information to a police officer) as soon as he checked LEDS and found nobody named Stacy Lynn Burke in either Oregon or Washington. Defendant acknowledged

---

[1] We use the term "warrants check" in a generic sense in this opinion, as the record does not reflect the precise nature of the information that Barrett sought when he ran the passenger's name and the name Stacy Lynn Burke through LEDS.

that Barrett had probable cause to believe that she was engaged in criminal activity once he ran the LEDS check, but questioned "how they get to that stage"; in defendant's view, she already had been detained, without reasonable suspicion, before Barrett checked the false name that she had given him.

The trial court denied defendant's suppression motion. Two aspects of the trial court's ruling inform our analysis. First, the trial court found that Barrett developed reasonable suspicion that defendant had given him a false name when he ran the name Stacy Lynn Burke through LEDS "and [came] up with no matches but a similar name with a restraining order * * *." Second, the court ruled that everything that occurred before that point was "mere conversation." After the court denied defendant's suppression motion, the contempt case proceeded immediately to trial. The court found that defendant had violated the no-contact order and entered the judgment finding her in contempt.

On appeal, defendant argues that the trial court should have granted her suppression motion because Barrett stopped her *before* he developed reasonable suspicion that she had given him a false name. Defendant relies on the totality of the circumstances: Barrett parked his patrol car where defendant could see it; he asked defendant and her companion about criminal activity, whether they had seen anything suspicious, and what they were doing; he requested defendant's name and took the passenger's driver's license; and he returned to his patrol car, which was visible to defendant and the passenger, and ran the names through LEDS. Under those circumstances, defendant argues, Barrett's conduct amounted to a show of authority that would cause a reasonable person in defendant's situation to believe that she was not free to leave. Defendant concludes, therefore, that she was stopped before Barrett developed reasonable suspicion that she had engaged in criminal activity.

The state makes a single argument in response: that defendant had not yet been stopped when Barrett developed reasonable suspicion, after checking LEDS, that defendant

had given him a false name.[2] The state acknowledges that a reasonable person in defendant's situation could have inferred that Barrett was checking the passenger's records, given his retention of the passenger's license, but it contends that the circumstances "do not as readily give rise to the inference that Barrett also was running a check *** on defendant, such that defendant was not free to leave." That is so, according to the state, because Barrett had not obtained a license or other identifying documents from defendant when he returned to his patrol car with the passenger's license. Thus, the state argues, "this is not a situation where a person *knew* that she was the subject of a pending warrants check—the situation in which a person clearly has been seized under Article I, section 9." (Emphasis in original.)

Before analyzing the parties' arguments, we briefly summarize the pertinent legal principles. Article I, section 9, of the Oregon Constitution prohibits unreasonable searches and seizures.[3] Two kinds of encounters between law enforcement officers and other individuals constitute seizures: "stops," which are "a type of seizure that involves a temporary restraint on a person's liberty," and "'arrests,' which are restraints on an individual's liberty that are steps toward charging individuals with a crime." *State v. Ashbaugh*, 349 Or 297, 308-09, 244 P3d 360 (2010). A stop violates Article I, section 9, unless it is "justified by, for example, necessities of a safety emergency or by reasonable suspicion that the person has been involved in criminal activity." *Id.* at 309. An arrest "must be justified by probable cause to believe that the arrested individual has, in fact, committed a crime." *Id.*

In contrast to stops and arrests, a noncoercive encounter—or "mere conversation"—between police officers

---

[2] The state does not contend that Barrett had reasonable suspicion of any criminal activity before then.

[3] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

and other individuals requires no justification. *Id.* "The thing that distinguishes 'seizures'—that is, 'stops' and 'arrests'—from encounters that are 'mere conversation' is the imposition, either by physical force or through some 'show of authority,' of some restraint on the individual's liberty." *Id.* Thus,

> "[a] 'seizure' of a person occurs under Article I, section 9, of the Oregon Constitution: (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances would believe that (a) above has occurred."

*Id.* at 316.

In analyzing whether a given set of circumstances would lead a reasonable person to believe that his or her liberty has been restrained, a police officer's act of running a warrants check on that person may be significant. It is important to note that an officer does not stop a person merely by requesting identification, absent other coercive circumstances. *State v. Thompson*, 254 Or App 282, 286-87, 293 P3d 1082 (2012). As the state acknowledges, however, if the person knows that the officer is performing a warrants check on that identification, the person generally has been stopped, at least if the officer also has questioned the person about possible criminal activity. *State v. Radtke*, 242 Or App 234, 240, 255 P3d 543 (2011). A seizure has occurred because a reasonable person in that latter situation, knowing that he or she is the subject of an ongoing criminal investigation, would not feel free to leave. *Id.* at 241; *see Thompson*, 254 Or App at 287 (if an officer "takes the person's identification card and then radios the information that it contains to 'dispatch,' the person is stopped, because the person at that point has reason to believe that he or she has become the object of a law enforcement investigation, at least until the person is informed that the 'warrant check' revealed no inculpatory information").

We applied those general principles in *Radtke*, the primary case upon which defendant relies on appeal. In *Radtke*, the defendant rode her bicycle into a parking lot where she planned to meet another person. When she

arrived, she saw that the man whom she had intended to meet was seated in the back of a patrol car and was talking to a police officer. The officer then asked for the defendant's name and date of birth, wrote down that information, and "immediately proceeded to question her about drugs and weapons on her person." 242 Or App at 237, 240. Under those circumstances, we held, the defendant was seized because she "was not only being questioned about illegal activity, she was under the impression that the police had begun an investigation of her and had not given her any reason to believe that it had ended." *Id.* at 241.

The circumstances in this case are analogous to those in *Radtke.* Officer Barrett encountered defendant and her passenger in a parking lot, questioned them about possible criminal activity in the area, asked what they were doing, and immediately requested their identification. Then, armed with the passenger's driver's license and the identifying information that defendant had provided him orally, Barrett returned to his patrol car to run a LEDS check. Under those circumstances, a reasonable person would have believed that Barrett was running her name, as well as the passenger's, particularly given that defendant apparently was the driver of the vehicle and therefore was the person whose license status would have been most immediately significant. In light of Barrett's inquiries about criminal activity and what defendant and the passenger were doing, a reasonable person in defendant's circumstances also would have believed that the warrants check signaled that she was being subjected to a criminal investigation and was, therefore, not free to leave. In short, defendant was stopped before Barrett discovered that she probably had given him a false name, which is when he first developed reasonable suspicion that she had engaged in criminal activity.

In arguing to the contrary, the state relies primarily on our decision in *State v. Maxie*, 235 Or App 49, 230 P3d 69 (2010), in which we held that the defendant's encounter with a police officer was "mere conversation," not a stop. In *Maxie*, a police officer saw the defendant slumped down in a parked car, drove down the road and parked his patrol car so it would not be visible to the defendant, and then walked back to the parked car and spoke to the defendant through

a partially opened window. *Id.* at 51. The officer asked the defendant whether everything was all right, and she responded that she had fought with her husband. The officer "then explained to defendant that the area was known to be a high-crime area involving drugs and prostitution and that he 'simply wanted to make sure that nothing illegal was occurring.'" *Id.* After the defendant said that nothing illegal was occurring, the officer asked for her identification. Having written down the defendant's name and date of birth, the officer returned to his patrol car—which was not visible to the defendant—and ran a records check. *Id.* at 51-52. The officer returned to the defendant's car and, after asking her whether she possessed any illegal items, asked whether he could search her. Subsequent consent searches revealed controlled substances.

On appeal after conviction for drug crimes and driving while suspended, the *Maxie* defendant argued that the trial court had erred when it denied her motion to suppress the evidence obtained during the searches, which she contended had been obtained during the course of an unlawful stop. We rejected that argument for two reasons. First, the officer's discussion with the defendant about possible criminal activity was "general in nature and did not impart to defendant the suggestion that she was the subject of an ongoing investigation into any particular criminal activity." *Id.* at 54. Second, the facts were not such that a reasonable person in the defendant's situation would have believed "that her liberty had been restricted, that is, that she was required to remain in her parked car while [the officer] ran a warrant check to determine if there was an outstanding warrant for her arrest." *Id.* at 55. Unlike cases in which officers' actions informed the defendants that they were the subject of warrants checks, the *Maxie* officer simply wrote down the defendant's information in his notebook, closed the notebook and put it in his pocket, then walked away. *Id.* Under those circumstances—and because the officer "did not communicate to defendant his intention to make any use of" the identifying information she had given him—the warrants check did not restrain the defendant's liberty or freedom of movement. *Id.* at 55-56.

The state asserts that here, too, Barrett simply engaged in conversation about criminal activity in the neighborhood with defendant and her passenger; he did not suggest directly that they might have committed crimes themselves. We agree that Barrett's conversation with defendant resembles the *Maxie* officer's conversation with the defendant in that case more than it resembles the *Radtke* officer's inquiry about whether the defendant in that case had "any drugs, weapons, [or] anything illegal on her." *Radtke*, 242 Or App at 237 (brackets in *Radtke*; internal quotation marks omitted). But we do not find that resemblance dispositive. The more important point is that the *Maxie* defendant had no reason to believe that the officer was running a warrants check on her that made her the subject of a pending criminal investigation. Here, as explained above, a reasonable person in defendant's circumstances would have believed that such an investigation was underway.

For similar reasons, we reject the state's suggestion that this case is like *State v. Soto*, 252 Or App 50, 284 P3d 1254, *rev den*, 353 Or 127 (2012). There, too, the police officer who encountered the defendant did nothing to "indicate that he was going to run a warrants check" on the defendant. *Id.* at 58. Instead, he asked for the defendant's name "merely to figure out to whom he was talking—something a reasonable person engaged in a conversation with a stranger would expect the stranger to ask—and not to initiate a criminal investigation of defendant." *Id.* Thus, in *Soto*, as in *Maxie*, a reasonable person in the defendant's situation would not have believed that he was the subject of a warrants check that restrained his liberty or freedom of movement. For that reason, *Soto* does not aid the state here.

In sum, we conclude that, given the totality of the circumstances that existed when Barrett returned to his patrol car after obtaining the passenger's driver's license and a name from defendant, a reasonable person in defendant's circumstances would have believed that Barrett was running a warrants check on the name she had given him and that, given his other inquiries, she was the subject of a criminal investigation and was not free to walk or drive away. The state does not contend either that Barrett had

reasonable suspicion of criminal activity before he checked LEDS or that the evidence that defendant sought to suppress was not discovered as a result of the unjustified stop. Accordingly, the trial court erred when it denied defendant's motion to suppress.

Reversed and remanded.