443

Submitted on remand from the Oregon Supreme Court April 18, affirmed
July 30, 2014

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

STACY LYNN DIERKS,
*Defendant-Appellant.*

Multnomah County Circuit Court
110545450; A149290

332 P3d 348

Peter Gartlan, Chief Defender, and Morgen E. Daniels,
Deputy Public Defender, Office of Public Defense Services,
filed the briefs for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and David B. Thompson, Senior Assistant Attorney General, filed the briefs for respondent.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

HADLOCK, J.

**HADLOCK, J.,**

In our original opinion in this case, we reversed a judgment that found defendant in contempt for having violated the terms of a no-contact order issued by a Washington court. *State v. Dierks*, 257 Or App 88, 90, 306 P3d 653 (2013) (*Dierks I*), vac'd and rem'd, 354 Or 837, 325 P3d 738 (2014) (*Dierks II*). We did so after concluding that a police officer had "stopped" defendant without reasonable suspicion, in violation of Article I, section 9, of the Oregon Constitution, and that the trial court erred when it denied defendant's motion to suppress the evidence that the officer discovered as a result of that stop. *Dierks I*, 257 Or App at 97-98. The Supreme Court subsequently vacated that opinion and remanded the case to us for reconsideration in light of its decisions in *State v. Backstrand*, 354 Or 392, 313 P3d 1084 (2013), and other cases. *Dierks II*, 354 Or 837. We now conclude that the pertinent actions of the officer did not amount to a stop and, therefore, the trial court did not err by denying defendant's motion to suppress. Accordingly, we affirm.[1]

We recount the historical and procedural facts as described in *Dierks I*:

"On the day in question, Gresham Police Officer Barrett was on patrol in the Rockwood neighborhood, which he described as 'a high-crime, high-drug, high-gang area.' Barrett spotted a single car parked in a small parking lot where, in the past, he had encountered people who were engaged in drug deals. Barrett, who was in uniform, pulled his marked patrol car into the parking lot; as he arrived, he saw the two occupants of the other car 'look up at [him] and realize [he] was there.' Barrett parked without blocking the other car and without turning on his emergency lights. He then approached the parked car and spoke with defendant, who appeared to be the driver, and defendant's passenger, explaining that they were in 'a very high-drug, high-crime area.' Barrett asked defendant and the passenger whether they had seen anything suspicious; he also asked what they were doing. Defendant and the passenger told Barrett that they were waiting for a friend.

---

[1] We reject without discussion the arguments that defendant makes in her second and third assignments of error.

"Barrett then asked defendant and the passenger for their names. Defendant said that her name was Stacy Lynn Burke and that she was licensed to drive in Washington, but did not have the license with her. The passenger responded to Barrett's inquiry by identifying himself and providing Barrett with his driver's license. Barrett returned to his car and ran the name Stacy Lynn Burke through the Law Enforcement Data System (LEDS) in both Oregon and Washington, but nothing came up in either state. When Barrett ran the passenger's name, he testified, he discovered that the passenger 'had a valid restraining order against someone by the name of Stacy Lynn Dierks, *** which was very similar to Stacy Lynn Burke ***.' At that point, Barrett thought that defendant had lied to him about her identity.

"Because Barrett thought that defendant might be the Stacy Lynn Dierks against whom the no-contact order had issued, he asked if she had any photo identification with her. As defendant looked through her purse, Barrett saw her twice pass by a paper copy of a Washington driver's license. Barrett pointed that out to defendant, who then handed him the document, which reflected her true identity.

"After she was charged with contempt for having violated the no-contact order, defendant moved to suppress the evidence of her identity that Barrett had obtained during the parking-lot encounter, arguing that Barrett had seized her by asking for her name and performing a warrants check.[1] Under those circumstances, defendant argued, a reasonable person would not have felt free to leave, particularly given the officer's retention of the passenger's license while he checked LEDS. The state responded that Barrett did not stop defendant simply by questioning her and asking for her identification. In any event, the state argued, Barrett had reasonable suspicion that defendant had committed a crime (providing false information to a police officer) as soon as he checked LEDS and found nobody named Stacy Lynn Burke in either Oregon or Washington. Defendant acknowledged that Barrett had probable cause to believe that she was engaged in criminal activity once he ran the LEDS check, but questioned 'how they get to that stage'; in defendant's view, she already had been detained, without reasonable suspicion, before Barrett checked the false name that she had given him.

"The trial court denied defendant's suppression motion. Two aspects of the trial court's ruling inform our analysis. First, the trial court found that Barrett developed reasonable suspicion that defendant had given him a false name when he ran the name Stacy Lynn Burke through LEDS 'and [came] up with no matches but a similar name with a restraining order * * *.' Second, the court ruled that everything that occurred before that point was 'mere conversation.' After the court denied defendant's suppression motion, the contempt case proceeded immediately to trial. The court found that defendant had violated the no-contact order and entered the judgment finding her in contempt.

---

"[1] We use the term 'warrants check' in a generic sense in this opinion, as the record does not reflect the precise nature of the information that Barrett sought when he ran the passenger's name and the name Stacy Lynn Burke through LEDS."

*Dierks I*, 257 Or App at 90-92. As explained in *Dierks I*, defendant acknowledges that Barrett had probable cause to believe that defendant had committed a crime (providing false information to a police officer) once he ran the LEDS checks. *Id.* at 91-92. And the state does not contend that Barrett developed reasonable suspicion of criminal activity at any point before he ran those checks. *Id.* at 93 n 2. Accordingly, the only question before us is whether Barrett had stopped defendant before he developed reasonable suspicion as a result of running the LEDS checks, *i.e.*, when he conversed with defendant and her companion, and then returned to his patrol car to run those checks.

In supplemental briefing, defendant argues that the circumstances in this case amounted to a stop because

"the combination of the content of the officer's questions and his actions—writing down defendant's identifying information, taking her companion's identification and going to run a warrants check—conveyed to any reasonable person that he intended to restrict defendant's freedom of movement to investigate (1) her identity, (2) whether she or her companion had outstanding warrants, and (3) what criminal conduct she and her companion might be engaging in in this 'suspicious' location. The officer told them at

the beginning of the interaction that they had parked in a high-crime area and asked them to explain what they were doing there. A reasonable person would believe that the officer was investigating her possible involvement in a drug crime, not just satisfying his curiosity about their presence in that location."

In response, the state contends that Barrett's questions to defendant were of the kind that the Supreme Court held, in *Backstrand* and its companion cases, did not constitute a stop. In making that argument, the state observes—accurately—that no evidence in the record suggests that defendant reasonably would have believed that Barrett was going to check the name she had given him for *warrants* in addition to (or instead of) running a different type of records check through LEDS.[2]

In considering the parties' arguments, we are guided by the Supreme Court's decisions in *Backstrand* and two other cases decided the same day: *State v. Anderson*, 354 Or 440, 313 P3d 1113 (2013), and *State v. Highley*, 354 Or 459, 313 P3d 1068 (2013). In *Backstrand*, the Supreme Court explained that an encounter between a citizen and a police officer amounts to a seizure for purposes of Article I, section 9,

"only if the officer's conduct would be reasonably perceived as coercive in the sense that it would cause the citizen to reasonably believe that the officer is intentionally restraining the citizen's liberty or freedom of movement in a significant way—that is, in a way that exceeds the bounds of ordinary social encounters between private citizens."

354 Or at 400. Thus, a police officer does not stop a person merely by approaching the person and "asking a question, requesting information, or seeking [that] individual's cooperation." *Id.* at 403. "Rather, something more * * * is

---

[2] We implied as much in *Dierks I*, in which we explained that we used the term "warrants check" in a "generic sense" in that opinion, "as the record does not reflect the precise nature of the information that Barrett sought when he ran the passenger's name and the name Stacy Lynn Burke through LEDS." 257 Or App at 91 n 1. (Pre-*Backstrand*, our opinions did not always distinguish between the various types of records checks that a police officer may run on a person's identification.) Because the record does not indicate that Barrett specifically ran a *warrants* check on defendant, we do not address whether any such check would have transformed this encounter into a stop.

required," which "can be such things as the content or manner of questioning, or the accompanying physical acts by the officer, if those added factors would reasonably be construed as a 'threatening or coercive' show of authority requiring compliance with the officer's request." *Id.* But an officer's inquiries by themselves, without that "something more," do not amount to a stop even though the questioned person may be "discomforted" by the "officer's approach and request for assistance or information[.]" *Id.* at 400.

Those principles apply to police officers' requests for identification. *Id.* at 408. Thus, an officer's "mere request for identification made * * * in the course of an otherwise lawful police-citizen encounter does not, in and of itself, result in a seizure." *Id.* at 410. That is true even though the person whose identification is sought "may not subjectively feel comfortable refusing the officer's request * * * for any number of personal reasons or instincts[.]" *Id.* at 413. Again, such personal "motivations and feelings" are not controlling. *Id.* Rather, a seizure results from a request that a person produce identification only "when the content of the questions, the manner of asking them, or other actions that police take (along with the circumstances in which they take them) would convey to a reasonable person that the police are exercising their authority to coercively detain the citizen[.]" *Id.* at 412.

In *Backstrand*, the Supreme Court applied those principles in holding that a police officer had not stopped a youthful-looking defendant, who was shopping at a "'triple-X' store that sells adult sexual materials," when the officer asked the defendant how old he was, requested his identification, and—after obtaining the defendant's driver license— verified its validity. *Id.* at 394, 413-14. The court explained that the officer's questions were not coercive because, in the context in which they were asked, they would not have caused a reasonable person to believe that the officer was significantly restraining his or her liberty. *Id.* at 414-16. The court further held that the officer's brief retention of the defendant's license (for no more than 10 or 15 seconds) while he provided the defendant's information to dispatch did not "result in a *significant* restriction" of his liberty. *Id.* at 416

(emphasis in original). Accordingly, no seizure occurred for purposes of Article I, section 9. *Id.* at 417-18.

The Supreme Court reached a similar conclusion in *Anderson*, in which it addressed the constitutionality of an interaction between police officers and two people who arrived at an apartment complex where the officers were executing a search warrant. 354 Or 440. Those people, including the defendant, approached the apartment that was the focus of the warrant, but they briskly returned to their car after they saw officers conducting the search. *Id.* at 443. Three of the officers followed the people back to their car, explained that they were executing a search warrant, and said they were contacting the defendant and his companion to find out who they were, "what interest they might have had" with what the officers were doing at the apartment, or whether they knew the person who lived there. The officers also asked the defendant and his companion for identification. The defendant denied that he had identification with him and gave a name that one of the officers knew was incorrect. That officer said to the defendant, "you're not him, I recognize you," and asked the defendant to step out of the car. *Id.* at 444. The defendant unsuccessfully moved to suppress evidence that the officers subsequently discovered.

On review, the Supreme Court addressed whether the officers seized the defendant before they asked him to get out of the car. The court held that no seizure occurred before that point, even though the officers' explanation of what they were doing at the apartment complex "objectively conveyed possible suspicion that [the defendant and his companion] could be involved in criminal activity related to the apartment" and "equally conveyed that the officers were interested in whatever information the two might be able to provide." *Id.* at 453. "In all events," the court explained, "by those brief verbal exchanges and inquiries alone, the officers did not communicate an exercise of authority of the kind required for a seizure—*i.e.*, authority to restrain." *Id.* The court found significant that the uniformed officers "took no physical action other than to approach the parked car" and "requested no physical action from defendant and the driver at that point." *Id.* at 454. Even though more than one officer

was present, the circumstances "would not cause a reasonable person seated in the car to believe that the officers were significantly restricting his or her liberty." *Id.*

The facts in this case are, if anything, less coercive than those involved in *Anderson*. Here, a single police officer approached a parked car, informed its occupants that they were in a high-crime area, asked if they had seen anything suspicious, and asked what they were doing. Thus, as in *Anderson*, although the officer's questions may have signaled to defendant that the officer suspected that she and her companion might be involved in criminal activity, those questions "equally conveyed that the [officer was] interested in whatever information the two might be able to provide." *Id.* at 453. Also as in *Anderson*, the police officer here "took no physical action other than to approach the parked car" and "requested no physical action from defendant and [her companion] at that point." *Id.* at 454. And *unlike* in *Anderson*, here defendant was approached by only one police officer, defendant had not associated herself with a location in which an *active* criminal investigation was underway, and the officer did not question defendant about her possible acquaintance with the subjects of any such investigation. Given the Supreme Court's conclusion that the officers in *Anderson* did not stop the defendant in that case when they asked for his identification, we readily conclude that Barrett did not stop defendant when he asked her name. *See also State v. Campbell*, 263 Or App 315, 319, 327 P3d 1188 (2014) ("[U]nder *Backstrand*, a request and tender of identification does not, in itself, transform a police-citizen encounter into a seizure []").

Nor did Barrett stop defendant when he returned to his patrol car and ran the name that she had given him, as well as her companion's name, through LEDS. *Backstrand* teaches that a police officer does not stop a person merely by verifying the validity of identification provided by that person; that action does not transform an "otherwise noncoercive encounter [into] a *coercive* restraint on the person's liberty." 354 Or at 413 (emphasis in original). The Supreme Court applied that principle in *Highley*, holding that a police officer does not stop a person by asking the person for

identification, then retaining the person's identification "for a reasonable time" while "verify[ing] the person's identity or status." 354 Or at 469-70. That is precisely what Barrett did here. After obtaining a name from defendant and her companion's license, he returned to his car to run a LEDS check on the two names. Nothing in the record suggests that Barrett took an unreasonable amount of time to do so or took any other action that would have "objectively convey[ed] an exercise of the officer's authority to restrain the person's liberty or freedom of movement." *Backstrand*, 354 Or at 413.

In sum, the actions that Barrett took during his encounter with defendant and her companion would not have conveyed to a reasonable person that Barrett was exercising his authority to coercively detain them. Accordingly, Barrett did not seize defendant during that encounter. The trial court correctly denied defendant's motion to suppress.

Affirmed.