Argued and submitted August 21, 2013, affirmed October 29, 2014, petition for review denied March 26, 2015 (357 Or 112)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

PETR VASILYEVICH RUDNITSKYY,
*Defendant-Appellant.*

Clackamas County Circuit Court
CR0901518; A147885

338 P3d 742

David Sherbo-Huggins, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Jeff J. Payne, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

ARMSTRONG, P. J.

Egan, J., dissenting.

## ARMSTRONG, P. J.

Defendant appeals a judgment of conviction for one count of unlawful possession of heroin, ORS 475.854, assigning error to the trial court's denial of his motion to suppress evidence obtained after he was stopped by a Clackamas County deputy sheriff. Defendant contends that the officer stopped him without first developing reasonable suspicion that he was engaged in criminal activity, thereby violating Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. We affirm.

We review a trial court's denial of a suppression motion for legal error, deferring to the trial court's findings of historical fact when there is constitutionally sufficient evidence in the record to support them. *State v. Bertha*, 256 Or App 375, 378, 300 P3d 265 (2013). In the absence of express findings, we resolve any factual disputes consistently with the trial court's ultimate conclusion. *Id.* We state the facts in accordance with that standard.

Witnessing what she believed to be an illegal drug transaction, a named informant contacted the Clackamas County Sheriff's Department. The informant reported that the transaction involved people in two cars—a black Hyundai and a yellow Subaru—that were parked at the far end of a McDonald's parking lot. A Clackamas County Sheriff's dispatcher conveyed the informant's report to Deputy Sheriff Schoenfeld, who knew that that McDonald's parking lot was a common location for the purchase and sale of heroin. Schoenfeld arrived at the McDonald's approximately one minute after receiving the informant's report. Schoenfeld testified at the suppression hearing, that, as he drove to the McDonald's parking lot, the dispatcher had told him that

"[the informant] had observed two Hispanic males in a black Hyundai with no front license plate back into a parking space, door to door with the driver of a yellow Subaru with [an identified Oregon license plate] * * * in the parking lot behind [the McDonald's]. * * * [The informant] related to dispatch that she observed what she believed was an illegal drug transaction between the driver of the yellow car and the driver of the black car."

On his arrival at the parking lot, Schoenfeld found the yellow Subaru as it had been described by the informant. The two occupants of the Subaru—defendant, who was the driver, and a passenger—were talking to a third person who was leaning into defendant's window. The black Hyundai was not present. Schoenfeld parked his patrol car "slightly behind and a little away from" the Subaru, which was facing a row of planters and could not drive forward. Schoenfeld testified:

> "I didn't intend on blocking them in. In that area I've got lots of police officers in the area. You can see how I parked there [on a diagram]. I wasn't trying to block them in purposely. And the way I parked, [the driver] could have backed out and then pulled out that driveway."

Schoenfeld then got out of his patrol car and approached the Subaru; he did not activate his emergency lights and kept his gun holstered.

Regarding what happened next, Schoenfeld testified at the suppression hearing:

> "[T]hey didn't even notice my patrol car pulling up. I was actually able to walk up to the door of the driver, that open window, and asked the guy [who] was near the window to step back near the curb. * * * I walked right up to the window, which was open, and I contacted the driver. And right when I contacted him, he dropped his hands to his lap. And what he was trying to hide was a lighter in his hand and a plastic straw."

Schoenfeld later clarified that he had seen the straw in the driver's hand at that moment but only identified the lighter later, based on its proximity to the straw. He also testified that straws and lighters are commonly used to smoke heroin. Schoenfeld immediately ordered defendant and the passenger to place their hands on the dashboard.

After waiting for backup to arrive, Schoenfeld explained to defendant that a witness had seen him purchasing narcotics, and he asked defendant for consent to search the car. Defendant consented, and the subsequent search produced several tinfoil squares, which Schoenfeld testified were similar to those typically used to smoke heroin, as well as a bag containing what the officers believed to

be heroin. Defendant and the passenger were given *Miranda* warnings, and defendant made a series of statements admitting that he had purchased the heroin.

Defendant filed a pretrial motion to suppress all evidence obtained as a result of the stop. He argued that Schoenfeld had stopped him when Schoenfeld parked behind the Subaru and that, at that time, Schoenfeld did not have reasonable suspicion that defendant was engaged in criminal activity. In defendant's view, the information that Schoenfeld had received from the dispatcher was insufficient to create a reasonable suspicion of criminal activity because it lacked sufficient detail to support such a suspicion.

The trial court denied defendant's motion, concluding that "Schoenfeld had reasonable suspicion to stop the occupants of [the Subaru] based on the fact that the citizen informant who reported illegal drug activity in [the] car was named and showed other indicia of reliability." Because the trial court concluded that Schoenfeld had reasonable suspicion of criminal activity when Schoenfeld entered the parking lot and saw the Subaru, the court did not need to determine the point at which Schoenfeld stopped defendant. After a jury trial, defendant was convicted of unlawful possession of heroin.

On appeal, defendant renews his arguments, contending that Schoenfeld stopped defendant when he entered the McDonald's parking lot and parked his car "slightly behind and a little away from" the Subaru and that, at that time, Schoenfeld lacked reasonable suspicion of any criminal activity by defendant. In response, the state argues that Schoenfeld did not stop defendant until he ordered defendant and the passenger to place their hands on the dashboard and that, at that time, Schoenfeld had reasonable suspicion of criminal activity based on the informant's report, Schoenfeld's observations confirming details of the report, the paraphernalia in defendant's hands, and Schoenfeld's knowledge that the area was a known center of heroin distribution. We agree with the state.

Although they disagree as to the point at which it occurred, the state and defendant agree that Schoenfeld stopped defendant. Accordingly, we first determine when

the stop occurred. For an encounter between an officer and a citizen to be a seizure under Article I, section 9, the officer must add to the inherent pressures of a citizen-police encounter "by either physically restraining the citizen's liberty in a significant way or engaging in a 'show of authority' that, explicitly or implicitly, reasonably conveys to the person a significant restriction on the person's freedom to terminate the encounter or otherwise go about his or her ordinary affairs." *State v. Anderson*, 354 Or 440, 450, 313 P3d 1113 (2013) (citing *State v. Backstrand*, 354 Or 392, 402, 313 P3d 1084 (2013)). "The test is an objective one: Would a reasonable person believe that a law enforcement officer intentionally and significantly restricted, interfered with, or otherwise deprived the individual of his or her liberty or freedom of movement." *Backstrand*, 354 Or at 399.

With those principles in mind, and contrary to defendant's argument, we conclude that Schoenfeld did not stop defendant by entering the McDonald's parking lot and parking his patrol car "slightly behind and a little away from" the Subaru that defendant was driving. Schoenfeld testified that he did not intend to block the Subaru and, accordingly, that he had parked his patrol car in a manner that would have allowed defendant to back out of his parking space and leave the McDonald's parking lot. Thus, at that time, Schoenfeld did not "physically restrain[] [defendant's] liberty in a significant way." *See State v. Aronson*, 247 Or App 422, 426-28, 271 P3d 121 (2011), *rev den*, 352 Or 33 (2012) (officer's act of parking his car behind the defendant's car in a manner that would allow the defendant to leave a parking space did not constitute a stop).

We turn to the point at which defendant became aware that Schoenfeld was standing at the open window of the Subaru, and we conclude that the stop occurred at the moment that Schoenfeld ordered defendant to place his hands on the dashboard of the Subaru. That order was in direct response to defendant's attempt to hide the contents of his hands, including the plastic straw that Schoenfeld knew to be an item commonly associated with heroin use. The order constituted a stop, which we conclude was based on reasonable suspicion that defendant was engaged in criminal activity.

For reasonable suspicion to exist, an officer must subjectively believe that the person has committed or is about to commit a crime and that belief must be objectively reasonable. *State v. Maciel*, 254 Or App 530, 535, 295 P3d 145 (2013). To be objectively reasonable, the officer's suspicion must be based on specific and articulable facts. *State v. Ehly*, 317 Or 66, 80, 854 P2d 421 (1993).

Here, defendant's furtive gesture with the straw, combined with the informant's report that a drug transaction had occurred between people in the Subaru and those in a second vehicle moments before Schoenfeld arrived, Schoenfeld's knowledge that plastic straws are commonly used to smoke heroin, and Schoenfeld's knowledge that the parking lot in which the Subaru was located was a common location for the distribution of heroin, constitute specific and articulable facts that support reasonable suspicion that defendant was engaged in illegal drug activity. Accordingly, we conclude that Schoenfeld had reasonable suspicion to stop defendant at the moment that he did. *See State v. Hiner*, 240 Or App 175, 181, 246 P3d 35 (2010) ("Reasonable suspicion, as a basis for an investigatory stop, does not require that the facts as observed by the officer conclusively indicate illegal activity but, rather, only that those facts support the reasonable inference of illegal activity by that person.").

Because Schoenfeld had reasonable suspicion to stop defendant, the stop did not violate Article I, section 9, of the Oregon Constitution or the Fourth Amendment to the United States Constitution. It follows that the trial court did not err in denying defendant's motion to suppress evidence obtained as a result of that stop.

Affirmed.

**EGAN, J.,** dissenting.

The majority concludes that Deputy Sheriff Schoenfeld stopped defendant when he ordered defendant to place his hands on the Subaru's dashboard "in direct response to defendant's attempt to hide the contents of his hands" and determines that Schoenfeld had reasonable suspicion to support the stop. 266 Or App at 564. Because I dispute the point at which the stop occurred, I conclude that

Schoenfeld lacked reasonable suspicion to support the stop. Accordingly, I dissent.

I begin by noting several significant facts. At the suppression hearing, Schoenfeld testified that, while working the day shift, at 12:54 p.m., he received from dispatch a drug-vice complaint occurring at a McDonald's restaurant parking lot, which was known as a hotspot for the purchase and sale of heroin. From the dispatcher's report, Schoenfeld learned particularized information about the make, model, and license plates of the two vehicles, detailed descriptions of the vehicles' positioning, the number of occupants of each vehicle, and the ethnicity of the occupants. In contrast to that thorough description of the people and vehicle involved, as to criminal activity, Schoenfeld was told only that the informant had seen an "illegal drug transaction." He knew nothing of the type of drugs or the nature of the transaction.

Approximately 30 seconds to one minute after receiving the report from dispatch, Schoenfeld arrived at the McDonald's parking lot, pulled his marked patrol car directly behind the Subaru, and parked at an angle "to the back left corner of the vehicle" one to two car lengths— "between 10 and 25 feet"—from the rear of the Subaru. For safety purposes, he parked in a manner that allowed him to keep the driver (defendant), the passenger, and the third man standing at the driver's-side window in his field of vision. Although he did not intend to block the Subaru in, he also was not concerned about the vehicle driving away.

Schoenfeld further testified that he exited his vehicle quickly, taking an estimated four seconds to walk the distance between the two cars, because he believed that he might be able to witness the occupants possessing or smoking heroin. The third man noticed Schoenfeld approach and Schoenfeld immediately "ordered" him to step back from the Subaru; the man immediately followed Schoenfeld's directive. Schoenfeld continued to quickly approach the driver's-side door, noticed that the driver's window was down, and at that point, "contacted" the driver, *i.e.*, defendant. He smelled no odors emanating from the car and did not see any drugs or drug paraphernalia in the car. He *then* saw defendant drop his hands to his lap, dropping a McDonald's plastic

straw.[1] Believing that defendant was trying to hide something, Schoenfeld immediately ordered defendant and the passenger to place their hands on the dashboard. At that point, a mere 10 seconds had gone by since Schoenfeld left his car.

At the close of the suppression hearing, the trial court concluded that Schoenfeld had reasonable suspicion to support the stop based solely on the informant's report and the high-crime area of the McDonald's, but did not pinpoint exactly *when* the stop occurred. That determination is the crux of this appeal. As I explain below, I determine that Schoenfeld stopped defendant when he "contacted" defendant through his open window. Because I determine that Schoenfeld stopped defendant at an earlier point than does the majority, I also conclude that Schoenfeld lacked reasonable suspicion to stop defendant.

"A 'seizure' of a person occurs * * * (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances *would* believe that (a) above has occurred." *State v. Ashbaugh*, 349 Or 297, 316, 244 P3d 360 (2010) (emphasis in original); *see also State v. Backstrand*, 354 Or 392, 399 n 8, 313 P3d 1084 (2013) (declining to reconsider *Ashbaugh* test). A person is seized under Article I, section 9, of the Oregon Constitution, if the officer adds "to those inherent pressures [created by the officer's status as an authority figure] by * * * engaging in a show of authority that, explicitly or implicitly, reasonably conveys to the person a significant restriction on the person's freedom to terminate the encounter or otherwise go about his or her ordinary affairs." *State v. Anderson*, 354 Or 440, 450, 313 P3d 1113 (2013) (citing *Backstrand*, 354 Or at 402) (internal quotation marks omitted). To determine whether the officer has manifested such a "show of authority," it is necessary to examine the facts of each particular case, based on the totality of the circumstances. *Backstrand*, 354 Or at 399.

---

[1] As noted by the majority, although Schoenfeld originally testified that he had seen defendant holding a lighter and straw, he later clarified at the suppression hearing that he had initially seen defendant possess only a straw.

A show of authority may be established by the overall context of the police-citizen encounter, including the content of the officer's questions, the officer's manner and actions during the encounter, the officer's physical acts—such as drawing weapons, shining a spotlight on a vehicle, or activating emergency lights or sirens—as well as the number of officers present, the officer's positioning in relation to the defendant, the officer's subjective intent to allow the defendant to leave, and whether the officer communicated those intentions to the defendant or otherwise acted upon those intentions so as to significantly restrict the defendant's liberty or freedom of movement. *See, e.g., Anderson*, 354 Or App at 450-51 (content of officer's requests, manner of request, overall context of contact between officer and citizen); *Ashbaugh*, 349 Or at 317 (officer's positioning in relation to defendant, officer's manner and actions, and content of questions); *State v. Smith*, 247 Or App 624, 629, 270 P3d 382 (2012) (number of officers, physical acts, officer's positioning); *State v. Aronson*, 247 Or App 422, 428, 271 P3d 121 (2011), *rev den*, 352 Or 33 (2012) (spotlight); *State v. Calhoun*, 101 Or App 622, 624, 792 P2d 1223 (1990) (emergency lights and sirens).

Part of that context must take into account that, when an officer parks behind a defendant's car, that action may effectively prevent the defendant's egress. Thus, that action may transform a "mere" encounter into a seizure. *State v. Peterson*, 259 Or App 294, 300, 313 P3d 388 (2013); *see also State v. Mesenbrink*, 106 Or App 306, 309, 807 P2d 319, *rev den*, 312 Or 235 (1991) (a stop occurs "when an officer's vehicle blocks a vehicle in a manner that would prevent it from being driven away"); *Aronson*, 247 Or App at 428 (considerations relevant to the analysis of whether a reasonable person would feel free to leave include "where an officer's vehicle physically blocks a suspect's vehicle from being driven away").

Although Schoenfeld's subjective intent when parking the patrol car may not have been to block defendant's car in its parking spot, those actions are part of the totality of the circumstances to be considered when analyzing whether Schoenfeld engaged in a show of authority. As indicated, I look at the objective circumstances—*i.e.*, the actual

positioning of Schoenfeld's patrol car—and not the subjective circumstances—that Schoenfeld did not intend to block defendant's car but intended to take control of the situation. Those objective facts indicate that Schoenfeld's decision to position the patrol car directly behind the Subaru, only one to two car lengths away, sideways in the driving area of the parking lot—*i.e.*, the area that defendant needed to use if he decided to leave—effectively restricted defendant's freedom to terminate the encounter. Thus, the positioning of the patrol car is an important circumstance to consider in determining when Schoenfeld *engaged in a show of authority*.

That circumstance colors the remainder of the encounter for the purpose of the Article I, section 9, analysis. *See State v. Charles*, 263 Or App 578, 585, 331 P3d 1012 (2014) (in determining whether a defendant was seized, we do not examine an officer's actions separately, but instead analyze "whether all of the officer's actions combine to form a whole greater than the sum of its parts; that is, whether, based on the totality of the circumstances, a reasonable person would believe that the officer had intentionally and significantly deprived defendant of his freedom of movement").

The remainder of Schoenfeld's actions plainly indicate when he engaged in a show of authority. By parking in such a manner, Schoenfeld was able to cross the distance between the patrol car and the Subaru within seconds. This show of authority culminated in Schoenfeld's "contact" with defendant through the open window, which significantly restricted defendant's freedom to terminate the encounter and go about his affairs.

After Schoenfeld parked his car, within a span of 10 seconds, he rapidly approached the Subaru. Defendant and the third man were engaged in conversation as Schoenfeld approached. Before Schoenfeld could see into the vehicle and *before* seeing any furtive movements or evidence of illegal activity, he immediately ordered the third man to step back, interrupted the conversation between defendant and the third man, and positioned himself at the driver's door. By all indications, Schoenfeld physically blocked the

car door and restricted defendant's freedom of movement before he "contacted" defendant through his open window. All of Schoenfeld's actions alerted defendant to Schoenfeld's presence and made his seizure a *fait accompli*. According to Schoenfeld's testimony, it was only *after he contacted defendant* that he saw defendant drop his hands to his lap and ordered defendant (and the passenger) to put their hands on the dashboard.

In light of those circumstances, I readily conclude that Schoenfeld, in rapid succession, carried out actions that significantly restricted defendant's ability to "otherwise go about his * * * ordinary affairs." *Anderson*, 354 Or at 450.[2] Thus, I conclude that Schoenfeld engaged in a show of authority because he exercised control over the scene in a manner that exceeded the bounds of ordinary social encounters between private citizens. *Backstrand*, 354 Or at 399, 401. *But see State v. Dierks*, 264 Or App 443, 450-51, 332 P3d 348 (2014) (concluding that when police officer "approached a parked car, informed its occupants that they were in a high-crime area, asked if they had seen anything suspicious, and asked what they were doing," "took no physical action other than to approach the parked car," and "requested no physical action from defendant and [her companion,]" the officer's actions "did not communicate an exercise of authority of the kind required for a seizure—*i.e.*, authority to restrain" (brackets in original)); *Anderson*, 354 Or at 453 (concluding that no stop occurred when three officers approached the defendant and his companion, asked the two to identify themselves, engaged in conversation, made inquiries relating to a separate, but ongoing, investigation, and asked to see identification, because "by those brief verbal exchanges

---

[2] The majority too quickly bypasses the relevant facts relating to Schoenfeld's initial approach of the Subaru, jumping instead to "the point at which defendant became aware that Schoenfeld was standing at the open window of the Subaru." 266 Or App at 564. In determining when the stop occurred, the precise moment at which defendant became aware of the presence of a police officer and, relatedly, that the police officer was exerting control over the scene, are factors of decided importance. From a practical standpoint, it is difficult to conclude, as the majority appears to, that defendant was unaware of Schoenfeld's presence at the scene when Schoenfeld, while rapidly approaching defendant's car, ordered the third man to step back, interrupting defendant's conversation, which would have caused defendant to become aware that (a) a police officer was present and (b) was issuing orders to exert control over his companion.

and inquiries alone," the officers had not engaged in a show of authority).[3]

Having made that determination, I turn to analyze whether Schoenfeld had reasonable suspicion to support the stop. *Ashbaugh*, 349 Or at 308-09; ORS 131.615. Reasonable suspicion is a "belief that is reasonable under the totality of the circumstances existing at the time and place the peace officer acts." ORS 131.605(6); *State v. Faubion*, 258 Or App 184, 193, 308 P3d 337 (2013) (noting that, when evaluating reasonable suspicion, we examine the facts known to the officer at the time the stop occurred). As relevant here,[4] the objective test "requires the officer 'to point to specific and articulable facts,'" *State v. Aguilar*, 139 Or App 175, 182, 912 P2d 379, *rev den*, 323 Or 265 (1996) (quoting *State v. Ehly*, 317 Or 66, 80, 854 P2d 421 (1993)), which need not "conclusively indicate illegal activity but, rather, only [need to indicate] that those facts support the reasonable inference of illegal activity by that person," *State v. Hiner*, 240 Or App 175, 181, 246 P3d 35 (2010).

I conclude that Schoenfeld lacked reasonable suspicion to stop defendant. The majority bases much of its conclusion that reasonable suspicion existed on defendant's furtive gestures, defendant's presence in a high-crime area, Schoenfeld's knowledge that straws are often used to consume drugs, and the informant's report. That Schoenfeld saw defendant drop his hands to his lap, and, in Schoenfeld's

---

[3] Schoenfeld's actions as he approached defendant's car and contacted defendant through the window are sufficiently coercive to constitute a show of authority at that point. In *Dierks* and *Anderson*, the officers approached the defendants and initially asked them questions, asked for their identification, and, although the officers' questions "may have signaled to defendant that the officer suspected that she and her companion might be involved in criminal activity, those questions 'equally conveyed that the [officer was] interested in whatever information the two might be able to provide.'" *Dierks*, 264 Or App at 451 (quoting *Anderson*, 354 Or at 453). In this case, by contrast, Schoenfeld's actions involved no "mere conversation," but instead involved immediate orders to the third man and then to defendant and the passenger. Schoenfeld engaged in additional significant behavior by ordering the third man to step back—that is, he requested physical action from defendant's companion. *Cf. Dierks*, 264 Or App at 450 (concluding that no stop occurred when the officer had "'requested no physical action from defendant and [her companion] at that point'" (quoting *Anderson*, 354 Or at 450)).

[4] Reasonable suspicion "has subjective and objective components." *State v. Mitchele*, 240 Or App 86, 90, 251 P3d 760 (2010). Defendant does not contend that Schoenfeld lacked subjective suspicion; thus, I only analyze the objective prong.

view, was trying to hide something *after* he stopped defendant is of no import to the reasonable suspicion analysis. "When there is evidence that criminal activity has in fact just occurred, [furtive movements] may provide a basis for believing that the actor has participated in it." *State v. Butkovich*, 87 Or App 587, 591, 743 P2d 752, *rev den*, 304 Or 548 (1987). However, at the time of the stop, Schoenfeld had not observed any such evidence.

Further, a defendant's presence in a high-crime area carries minimal weight when evaluating the objective reasonableness of an officer's suspicion. *State v. Wiggins*, 262 Or App 351, 361, 324 P3d 626 (2014); *see also State v. Bertsch*, 251 Or App 128, 134, 284 P3d 502 (2012) ("[A] person's presence in a location associated with drug activity is insufficient to support an objectively reasonable belief that the person is himself * * * engaged in drug activity.").

Likewise, Schoenfeld's knowledge that plastic straws are commonly used to smoke heroin, while relevant, only nominally influences the analysis. Although an officer's knowledge and experience may help explain why a fact is suspicious, further elaboration by the officer is required to prove that "otherwise innocuous facts"—such as sitting in the parking lot of a McDonald's with a plastic straw in your hand during the lunch hour—"are evidence of criminal activity." *State v. Alvarado*, 257 Or App 612, 631, 307 P3d 540 (2013). Schoenfeld's "knowledge" alone "is not a magical incantation with the power to imbue speculation, stereotype, or pseudoscience with an impenetrable armor of veracity." *Id.* (quoting *State v. Daniels*, 234 Or App 533, 541, 228 P3d 695 (2010)).

That leaves only the informant's report. Although a reliable informant's report can "furnish the required specific and articulable facts to support" reasonable suspicion, *State v. Goss*, 219 Or App 645, 650, 184 P3d 1155, *rev den*, 345 Or 94 (2008) (internal quotation marks omitted), I agree with defendant that the "content of the information relayed to Schoenfeld"—recounting only that the informant had witnessed an "illegal drug transaction"—was too imprecise and vague, in itself, to support a reasonable belief that defendant had committed a crime.

Schoenfeld received a report that two vehicles were sitting door-to-door in a McDonald's parking lot during the noon hour. The report included detailed descriptions of the vehicles, the occupants—including the number and ethnicity—of the vehicles, but included only vague information relating to the illegal activity, *viz.*, that the informant had seen an "illegal drug transaction."

When Schoenfeld arrived in the parking lot less than a minute after receiving the report, he observed innocuous facts—the presence of one of the described vehicles in the reported parking lot—that tended to corroborate the informant's report. However, despite arriving so close in time after receiving the report, Schoenfeld saw *no* evidence of any illegal activity or anything that would indicate that an "illegal drug transaction" had recently occurred. Instead, as he arrived, he saw that the occupants of the Subaru were talking to a third person who had apparently arrived in the seconds between Schoenfeld's receipt of the report and his arrival at the parking lot.

The entire chain of events occurred in a very short span of time and, according to Schoenfeld's testimony, occurred sequentially. Neither the events that Schoenfeld observed *at the time of the stop*, nor the scant details provided by the informant's report were sufficient to constitute the "specific and articulable facts" required to support a reasonable suspicion. *See State v. Simpson*, 245 Or App 152, 156, 261 P3d 90 (2011) (explaining that the "quantity and quality" of information in an informant's report can affect a determination of reasonable suspicion); *State v. Hames*, 223 Or App 624, 635, 196 P3d 88 (2008) (noting that the totality of the circumstances includes "what an officer does not observe").

Thus, based on the totality of the circumstances, I would conclude that defendant was stopped when Schoenfeld contacted him through the open window, that stop was not supported by reasonable suspicion, and the subsequently obtained evidence should be suppressed.

Therefore, I dissent.